# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **MURRAY PAUL FARMER** | ) |
| and **DRC, INC.**, an Alabama | ) |
| corporation | ) |
| | ) |
|    Plaintiffs, | ) |
| | ) |
| vs. | ) CIVIL CASE NO.: |
| | ) |
| **RIXI   RAMONA** | ) |
| **MONCADA GODOY,** | ) |
| Individually and in her capacity | ) |
| As MINISTER OF FINANCE | ) |
| Of the REPUBLIC of HONDURAS | ) |
| And Democratic Socialist Candidate | ) |
| For President of Honduras | ) |
| and | ) |
| **REBECA SANTOS** | ) |
| Individually and in her | ) |
| capacity as President of the Central | ) |
| Bank of Honduras | ) |
| Of the REPUBLIC OF HONDURAS | ) |
| And | ) |
| **BANCO CENTRAL DE HONDURAS (BCH)**,) |  |
| a governmental instrumentality | ) |
| of the Republic of Honduras, | ) |
| Defendants. | ) |
| **MANUEL ANTONIO** | ) |
| **DIAZ GALEAS,** | ) |
| Individually | ) |
| and in his capacity as ATTORNEY | ) |
| GENERAL     (CIVIL) | ) |
| Of the REPUBLIC OF HONDURAS | ) |
| and | ) |
| **JOHEL ANTONIO** | ) |
| **ZELAYA ÁLVAREZ** | ) |
| Individually    and in his | ) |
| capacity as ATTORNEY | ) |
| GENERAL     (CRIMINAL) | ) |
| Of the REPUBLIC OF HONDURAS | ) |
| and | ) |
| **LUIS JAVIER SANTOS** | ) |
| Individually    and in his | ) |

capacity as special                    )
CRIMINAL PROSECUTOR                     )
Of the REPUBLIC OF HONDURAS            )
and                                     )
**MIGUEL CHIRINOS**                     )
Individually    and in his              )
capacity as special                    )
CRIMINAL PROSECUTOR                     )
Of the REPUBLIC OF HONDURAS            )
                                        )
      Defendants.                   )

## COMPLAINT

Comes now the Plaintiffs, Murray Paul Farmer (FARMER) and DRC, Inc. (DRC), an Alabama corporation, by and through undersigned counsel, and avers the following:

1.    This is a civil damages case arising from conduct criminal in nature, where PLAINTIFF **DRC, Inc. ("DRC")**, a U.S. contractor whose constitutional and contractual rights were violated by The Republic of Honduras. Honduras has, under the Democratic Socialist Publicly accused by U.S. Attorney General Pam Bondi of acting as a partner of Venezuela in trafficking drugs into the United States and is designated as a Terrorist Organization by Donald J. Trump, President, United States of America.  The current President of Honduras is Iris Xiomara Castro Saramiento[1], wife of former President Manuel "Mel" Zelaya[2][3], who was ousted in a 2009

---

[1] In a covert DEA recording recently released, shows that in November of 2013, Carlos Armando Zelaya Rosales, brother-in-law of President Xiomara Castro, and brother of COMANDANTE agreed to accept Six Hundred Fifty Thousand Dollars ($650,000.00) from the convicted narcotrafficking brothers known as Los Cachiros, explicitly stating that half of this sum was for the "COMANDANTE.  In addition, Carlos Zelaya was arrested in 1977 and imprisoned on charges of being an accomplice to the murders of university students Camilo Girón and Salomón Kafati in San Pedro Sula. He was released in 1980 pursuant to a general amnesty decree...

[2]  José Manuel Zelaya Ordóñez, father of former President Manuel "Mel" Zelaya, was convicted for his role in the 1975 Los Horcones Massacre, where two Catholic priests (Iván Betancourt of Colombia and Michael Cypher of the United States) and at least ten campesinos (Farmers) were murdered. He was sentenced to 20 years in prison but served little more than one year before being released under a general amnesty decree issued by the Honduran National Constituent Assembly on September 3, 1980, this same decree also issued amnesty to his son Carlos Zelaya.

[3] *Exhibit 69* is a photograph purportedly depicting Manuel "Mel" Zelaya Rosales in the 1970s before/after/during the Horcones Massacre.  In the image, Zelaya appears shirtless in a macho, guerrilla-style pose, wearing a Model 1911 .45 cal. Pistol in a chest holster second pistol in cross draw belt holster and a mac 10 carrying case over left

2

coup d'état and remains the undisputed political leader of the Socialist Democratic Party (LIBRE), commonly referred to in Honduras as the Commander or **"Comandante"**.

The claims are based on the personal and intentional misconduct of Defendant Rixi Ramona Moncada Godoy (MONCADA) a political appointee of the governing Socialist Democratic (LIBRE) Party, former Minister of Finance of the Republic of Honduras and current Socialist Candidate for the Office of President of Honduras (election scheduled in November, 2025), a known affiliate and supporter of Venezuela, Cuba & Nicaragua and Defendant Manuel Antonio Diaz Galeas (GALEAS), Socialist political appointee, and purported Attorney General of the Republic of Honduras/Procuraduria General de la Republica (PGR) (the PGR is similar to the Department of Justice in the United States),  Defendant Rebeca Santos (SANTOS), Socialist Political appointee to the Central Bank of Honduras, Defendant Johel Antonio Zelaya Alvarez (ZELAYA), Socialist political appointee to the Office of the Public Prosecutor, Ministerio Publico (MP) of the Republic of Honduras, Defendants Luis Javier Santos (SANTOS) and Miguel Chirinos (CHIRINOS) both specially appointed prosecutors of the MP by the Socialist Democratic Party, LIBRE. These Defendants used their personal power and the powers of the Honduran Government and their positions therein to defame, endanger, and obstruct the legal rights of Plaintiffs in the Republic of Honduras, U.S. District of Columbia and Mobile, Alabama USA. This misconduct also constituted a direct violation of binding bilateral agreements between the United States and the Republic of Honduras, including the 1961 U.S.–Honduras Bilateral Agreement for Technical and Economic Cooperation (Exhibit 1) and the 1999 Special Objective Grant Agreement between USAID and the GOH  (Exhibit 2).

shoulder, with a shotgun slung across his shoulder and a submachine gun in hand.  His appearance evokes the look of a rural insurgent or revolutionary fighter, strikingly similar to iconic images of Che Guevara during the Cuban Revolution [New York Times, July 3, 2009; Tiempo (Honduras) archives].

2.      Defendants colluded to obstruct payment and to politically persecute PLAINTIFF FARMER by fabricating a unilateral *sua sponte* criminal case designed to suspend and avoid enforcement of the Supreme Court "Final and Unappealable Order". The Supreme Cout issued a Payment Order for One Hundred Six Million Two Hundred Six Thousand Four Hundred Sixty and 51/100 ($106,206,460.51) U.S. Dollars, subsequent to its "Final and Unappealable Order" which then transferred these funds from the account of the Honduran Government to the account of the Supreme Court in anticipation of payment to Plaintiff DRC. (Exhibit 4).

3.      Defendants publicly named and defamed PLAINTIFFS FARMER and DRC, accused them of corruption and fraud, and vowed to block payment of a final binding Supreme Court of Honduras' "Final and Unappealable Order[4]" to pay PLAINTIFF DRC One Hundred Six Million Two Hundred Six Thousand Four Hundred Sixty and 51/100 ($106,206,460.51) U.S. Dollars owed from a contract long performed and completed (as described by the Honduran Supreme Court itself) in favor of DRC (Exhibit 3).

4.      Defendants' conduct caused direct injury to Plaintiffs in Alabama.

### **PARTIES**

5.      PLAINTIFF FARMER is a natural person, a U.S. citizen, and a resident of Mobile County, Alabama.

6.      PLAINTIFF DRC, Inc. is a South Carolina corporation organized under U.S. law with its principal place of business in Alabama.

---

[4] The amount due DRC is the original arbitration award plus Seven (7%) Percent interest compounded annually from the date of the award which, amounts in this Judgment were calculated and certified by a Honduran expert called an "Actuario" who are licensed by the Honduran Supreme Court. Only approximately twenty (20) individuals are licensed for this position of Actuario in Honduras.

4

7.     DEFENDANT MONCADA is a citizen and resident of the Republic of Honduras, former Minister of Finance and is current LIBRE Democratic Socialist candidate for President in the election to be held on November 30, 2025.

8.     DEFENDANT GALEAS is a citizen and resident of the Republic of Honduras and appointed by the LIBRE Democratic Socialist party as the purported Attorney General of the Republic of Honduras/Procuraduria General de la Republica (PGR)[5].

9.     DEFENDANT ZELAYA is a citizen and resident of the Republic of Honduras appointed by the LIBRE Democratic Socialist Party as Chief Public Prosecutor of the Office of the Public Prosecutor Ministerio Publico (MP).

10.    DEFENDANT SANTOS is a citizen and resident of the Republic of Honduras and appointed by the LIBRE Democratic Socialist Party as Public Prosecutor of the MP.

11.    DEFENDANT CHIRINOS is a citizen and resident of the Republic of Honduras and appointed by the LIBRE Democratic Socialist Party as Public Prosecutor of the MP.

12.    DEFENDANT SANTOS is a citizen and resident of the Republic of Honduras, serving as President of the Central Bank of Honduras (Banco Central de Honduras – BCH[6]).

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to *28 U.S.C. § 1332(a)(2)*. This Court also has jurisdiction[7] pursuant to 18 U.S.C. § 2334(a) of the Antiterrorism Act, because Plaintiffs are U.S. nationals injured by an act of international terrorism.

---

[5] PGR is the Honduran equivalent of the U.S. Attorney General's Office.
[6] Banco Central de Honduras (BCH) is added as a named defendant in its institutional capacity. BCH acted through its President Rebeca Santos and legal department to obstruct compliance with the Final and Unappealable Order of the Supreme Court of Honduras.
[7] This Court's jurisdiction is further supported by the fact that Plaintiffs' contract rights arose under U.S. treaty obligations and were funded with U.S. taxpayer dollars appropriated by Congress through USAID. Like the False Claims Act, which provides extraterritorial jurisdiction where U.S. funds are implicated, the ATA likewise applies extraterritorially to protect U.S. nationals targeted abroad while implementing U.S. programs

14.    Venue is proper under *28 U.S.C. § 1391(b)(2)*. Venue is further proper because the defamatory statements and threats were published online in the United States of America and caused injury in Mobile County, Alabama, where Plaintiffs reside and conduct business.

**FACTUAL ALLEGATIONS**

15.    On April 12, 1961, the United States and the Republic of Honduras signed the Bilateral Agreement for Technical and Economic Cooperation (TIAS 4800). Article IV of that Agreement provides that U.S. personnel and contractors engaged in cooperative programs "shall be granted the privileges and immunities accorded to members of the diplomatic mission of the United States," thereby immunizing U.S. contractors from Honduran criminal jurisdiction for acts performed under USAID[8]-funded projects. Article V further provides that such personnel and contractors are exempt from Honduran taxation, fees, and legal process.

16.    During October 1988 Hurricane Mitch struck Central America, causing catastrophic destruction. Honduras was the hardest-hit country: nearly seventy (70%) percent of its infrastructure was destroyed, including roads, bridges, schools, water systems, and sanitation facilities. Over 5,000 Hondurans were killed**,** and more than 1.5 million people — one-fifth of the population — were left homeless or displaced**.** The storm inflicted an estimated $3.8 billion in economic damages**,** wiping out decades of development.

---

[8] The U.S. Agency for International Development (USAID) was formally created by President John F. Kennedy through Executive Order 10973, issued pursuant to the Foreign Assistance Act of 1961 (Pub. L. 87-195, 75 Stat. 424). In announcing USAID's creation and the Alliance for Progress, President Kennedy declared that the United States would **"join with our neighbors to assist free men and free governments in casting off the chains of poverty and oppression, and in building a hemisphere where all men can live in dignity and freedom."** The Bilateral Agreement for Technical and Economic Cooperation (TIAS 4800) with Honduras was among the first bilateral instruments administered under this new framework, ensuring that U.S. government personnel and contractors were accorded the privileges and immunities of diplomatic mission members when carrying out USAID-funded projects abroad.

6

17.     On May 21, 1999, Congress enacted Public Law 106-31, the Emergency Supplemental Appropriations Act of 1999**,** appropriating nearly $1 billion for Central America's reconstruction after Hurricane Mitch. Honduras, the most devastated country, was allocated approximately $293 million through the International Disaster Assistance (IDA) account administered by USAID.

Congress did not donate these funds as mere foreign charity. The legislative record shows that the purpose was to stabilize Honduras, create jobs, and reduce migration pressures on the United States**.** Lawmakers recognized that without rapid reconstruction and economic recovery, instability would worsen, and large numbers of displaced Hondurans could attempt to migrate illegally to the U.S. The appropriation was therefore both humanitarian and strategic: to rebuild essential infrastructure, restore livelihoods, and generate local labor opportunities so Hondurans could remain and prosper in their own communities.

18.     On June 9, 1999, USAID and the GOH (GOH) executed the Special Objective Grant Agreement (SOAG), Program No. 522-0410, controlling USAID-financed infrastructure projects, including DRC's potable water and sanitation works. Article 6 confirmed that the Fondo Hondureno Inversion Social (FHIS) Executing Unit acted as an arm of the Honduran Government, and all actions of its members were deemed actions of the State.

Section 5 and Annex A of the SOAG expressly obligated Honduras to honor arbitral awards and judicial rulings arising from USAID-funded projects and to indemnify U.S. contractors against losses.

19.     Together, the 1961 Bilateral Agreement and the 1999 SOAG establish binding treaty protections: (a) U.S. contractors like PLAINTIFF'S FARMER and DRC are immune from Honduran criminal prosecution for acts performed within the scope of USAID projects; and (b)

Honduras is obligated to recognize and satisfy arbitral awards and final Judgments arising from such projects. Defendants' refusal to comply with these obligations, and their initiation of a politically motivated criminal prosecution based, therefrom, constitute a direct breach of international agreements with the United States. Under these agreements U.S. funds can only be obligated to a Government Agency, which FHIS clearly is and was.

20.    On August 16, 1999, Honduras and the United States executed Amendment No. 3 to the SOAG for Program 522-0410. Honduras acted through its Minister of Finance; the United States through the Embassy Chargé d'Affaires and USAID Mission Director. The amendment designated FHIS and SANAA as the national agencies responsible for Honduras's role, and the signature page confirmed FHIS signed in its governmental capacity. Read together with the June 9, 1999 SOAG—which deems FHIS actions as actions of the State—this Amendment confirms that claims FHIS was "not the GOH " are false. (Exhibit 52)

21.    On September 20, 1999, USAID issued Implementation Letter No. 1 to the Minister of Finance. The letter accepted the Honduran Attorney General's opinion confirming the June 9, 1999 SOAG was duly authorized and executed by the GOH , and acknowledged receipt of certified signatures of the Minister of Finance and Vice Ministers as authorized representatives. An accompanying Action Memorandum confirmed all conditions precedent for first disbursement had been met. (Exhibit 53)

22.    On January 27, 2000, The President of Honduras, Carlos Roberto Flores Facusse named Moises Starkman Pinel as Director of FHIS with Rank of Secretary of State (Exhibit 61). On April 12, 2000, USAID issued Implementation Letter No. 8 accepting the FHIS' Minister (Secretary of State of Honduras) as a GOH  representative. USAID acknowledged receipt of the Ministry of Finance's delegation of authority and certified signature, and accepting Moisés

Starkman Pinel, Minister of the FHIS and Secretary of State, as an additional representative of the GOH . (Exhibit 54)

23.      On March 14, 2000, the Ministry of Finance sent USAID the original Delegation of Authority naming the FHIS Minister, Moisés Starkman Pinel, as the Ministry of Finance's representative for the program authorized to carry out all procedures related to the execution of Grant Agreement No. 522-0410 (Hurricane Reconstruction Program). (Exhibit 57)

24.      On April 14, 2000, USAID published in The Commerce Business Daily in the United States of America an official notice stating that the GOH , acting through the FHIS was issuing an Invitation for Bids for the construction of water, sewerage, surface storm-drainage, and landfill works under the Hurricane Mitch reconstruction program. It states that financing originates from the United States Agency for International Development (USAID) and the GOH ; and that bids must include a bid bond directed to Minister (Secretary of State) Moisés Starkman Pinel, of FHIS**,** with receipt set for June 13, 2000, in Tegucigalpa. (Exhibit 55)

25.      On May 8, 2000, The Honduran PGR issued a legal opinion expressly identifying FHIS as part of the Executive Branch. (Exhibit 56)

26.      In 2000, FHIS commenced solicitation on various construction projects. DRC submitted bids on the construction projects to rebuild Honduras.

**DRC, INC.**

27.      On June 13, 2000, DRC, as a result of the solicitation process, was awarded the project aimed at building infrastructure in twenty-one remote villages in Honduras including potable water, sewer systems, drainage and basic environmental sanitation infrastructure for over 300,000 impoverished Hondurans.

28.     On June 21, 2000, FHIS and DRC signed a contract to commence reconstruction as a result of Hurricane Mitch. Said Contract provided lifesaving potable water, sewer and basic sanitation infrastructure to over 300,000 of the poorest Hondurans affected by Hurricane Mitch in 21 remote communities across Honduras. The Contract was signed in the Honduran Oval Office on live television by the President of Honduras Roberto Carlos Flores Facusse and the FHIS Director, who was also the Secretary of State, Moises Starkman Pinel. (Exhibit 5).  The Contract was signed at the time on behalf of DRC, by its Executive Vice President, Col. (Ret'd) Sid Vogel, the former Chief of Staff of the United States Corps. Of Engineers. DRC immediately mobilized all projects.

29.     On December 6, 2000 – the USAID Mission Director in Honduras, Timothy M. Mahoney, issued a formal letter to FHIS confirming that contractors under the Hurricane Mitch Reconstruction program were expressly authorized to subcontract [9] up to seventy-five (75%) percent of the project of the Work. The letter explained that while Honduran contracting law mentioned a forty (40%) percent cap, this restriction was not binding on USAID-funded projects, which were governed instead by the 1961 Bilateral Agreement and the 1999 Special Objective Grant Agreement**.** (Exhibit 6)

USAID's stated purpose was to promote and facilitate the participation of North American and Honduran construction companies**,** ensuring that U.S. prime contractors (U.S. procurement regulations required USAID/FHIS to hire U.S. Contractors as the prime contractor for the work)

---

[9] Thus, DRC's subcontracting of Honduran companies was not fraud as repeatedly alleged by USAID and FHIS when DRC refused to pay their representatives bribes, but a contractual and Congressional requirement**.** It fulfilled the very reason Congress appropriated the funds — to create jobs in Honduras — and was carried out under explicit written authorization from USAID. Any later accusation that subcontracting was fraudulent is contradicted by USAID's own approvals and by Congressional intent.

would hire local subcontractors to execute much of the work. This policy directly reflected Congress' mandate when appropriating nearly One Billion U.S. Dollars in 1999: the funds were to rebuild infrastructure quickly and generate labor opportunities for Hondurans to discourage illegal migration to the United States.

30.     On March 2, 2001, the Acting Mission Director of USAID wrote to DRC, Inc. and confirmed that the June 21, 2000, Construction Contract was "with the Honduran Social Investment Fund (FHIS) for the GOH … for the construction of water and sanitation systems". The letter further states that the Agency "is not a party to the contract between DRC and the GOH ," that the Agency's reserved approvals are "solely as a financier" and "do not make [the Agency] a party to the contract," and that "FHIS is the contracting authority and all decisions concerning contract management issues are the responsibility of FHIS." (Exhibit 58)

31.     On March 21, 2001 the GAO issued Report (GAO-01-541T) which determined that USAID's water and sanitation program in Honduras was behind schedule due to design flaws.  The report references findings by the U.S. Army Corps of Engineers (USACE) stating the projects required complete redesigns. GAO found this caused delays and increased costs, showing that cost overruns stemmed from USAID and FHIS design flaws and not DRC's performance. DRC was not paid for the redesign of the projects or the additional work due to FHIS and USAID's incomplete deficient designs. (Exhibit 66)

32.      On November 16, 2001, The United States Embassy issued DRC a "You Make A Difference" award at a special ceremony inside the U.S. Embassy. (Exhibit 6) This award was signed by U.S. Ambassador Frank Almaguer who mandated the use of subcontractors under the program to fulfill the goals of Congress.  It honored DRC for the successful completion of the Work on the 21 separate sites in the Contract.

33.     Between 2000 and 2002, USAID subjected DRC to more than twenty separate audits and investigations after DRC reported that FHIS and USAID officials, including Minister Moises Starkman Pinel, USAID Engineer Carlos Flores (later fired for corruption), USAID Engineer Mauricio Cruz and FHIS Auditor Dagoberto Flores, were demanding bribes. None of these audits ever identified fraud or criminal conduct by Plaintiffs. Instead, they confirmed the legitimacy of DRC's performance and exposed the retaliatory nature of the scrutiny. These audits, combined with subsequent prosecutorial declinations by both U.S. and Honduran authorities, underscore that Defendants' renewed accusations decades later are knowingly false and politically motivated. DRC was subject to consistent and repeated demands for bribes which it consistently refused to pay. For this, it was audited, accused and later forced to complete the projects without millions of U.S Dollars in payments; which payments remain unpaid, here, some twenty (20) years later.

34.     On March 5, 2003, USAID formally acknowledged the opinion of the U.S. Army Corps of Engineers (USACE) and approved payment of DRC's mobilization expense claim under its Group I contract, which is a payment of approximately One Million Eight Hundred Thousand ($1,800,000) U.S. Dollars. (Exhibit 8).

This letter is significant because it proves that both USAID and FHIS recognized DRC's claims as legitimate, payable obligations, based on USACE's independent review. It contradicts later false narratives of fraud and confirms that the U.S. Government itself approved payment for DRC's performance.

35.     Between 2002 and 2003 DRC finished the 21 individual projects without further pay[10] and with its own funds because DRC would not pay bribes. USAID partially funded the

---

[10] February of 2002 USAID issued its final partial payment to DRC.

projects but withdrew its funding from Honduras in February of 2002 due to irregularities in Honduras.

36.    On July 7, 2003, All projects were deemed completed by FHIS and per Honduran law FHIS issued multiple newspaper publications notifying the public that DRC satisfactorily completed each project. (Exhibit 9)

37.    USAID withdrew funding from Honduras thus breaching its treaty obligations with Honduras. DRC fulfilled its obligations under the contract, the USAID withdrawal of funding was due to USAID and FHIS corruption and mismanagement. To obtain funding for the Honduras' contract, DRC sued USAID directly in U.S. Courts, (*ASBCA No. 54206)* which case was dismissed on June 16, 2004, as DRC did not have an express contract with USAID. The decision stated: "*Clearly, the record shows that the USAID did not enter into an express or implied contract with DRC for the procurement of personal property, services, construction, maintenance of real property or disposal of personal property. The underlying construction contract was solely between FHIS and DRC; USAID was merely the financier…*" for Honduras! (Exhibit 10)

38.    On September 14, 2004, the U.S. Department of Justice, acting on behalf of USAID, filed a False Claims Act complaint against DRC, alleging fraud in connection with the Hurricane Mitch reconstruction contracts. The complaint claimed that DRC misrepresented its capacity and committed fraud by subcontracting most of the project work to Honduran firms while billing as though it had self-performed.

These allegations ignored USAID's own December 6, 2000, written approval authorizing prime contractors to subcontract up to seventy-five (75%) percent of the work to Honduran companies, in line with Congress' mandate that the emergency reconstruction program create local jobs and reduce migration pressures. It also ignored the partnership of DRC with a local Mobile Alabama

infrastructure company with additional experienced personnel listed in addition to DRC personnel within the prequalification submittals.

The case was later dismissed and in March 2007, the U.S. Attorney's Office formally declined prosecution. In September 2009 a three judge Honduran arbitration panel, after more than one-year of discovery and over a month of extensive hearings with dozens of witnesses, awarded DRC more than Fifty-One Million ($51,000,000.00) U. S. Dollars plus interest on the same contract finding that DRC did in fact have approval (emphasis added) to subcontract (Exhibit 11) and completed each and every one of the infrastructure projects to the complete satisfaction of FHIS, the Honduran Government, USAID, and U.S. Corps of Engineers (USACE).

39.    On April 21, 2005, the USACE issued a memorandum to USAID and FHIS reviewing a subset of DRC's Hurricane Mitch reconstruction contract claims. The reviewer concluded that the claims examined were "substantially sustainable" and recommended an equitable settlement be reached. Critically, the memorandum explicitly stated that not all of DRC's claims were reviewed — major categories such as extended overhead, breach of contract damages, late payments, and the broader Modified Total Cost Settlement Package remained unresolved, which was a claim of over Thirty Million ($30,000,000.00) U.S. Dollars (Exhibit 12) just for the portion of the Contract examined.

The USACE also found that FHIS directives — including staff purges, contract changes, and defective specifications — imposed excessive and costs on DRC, and that these costs were FHIS' responsibility, not DRC's. This partial review demonstrates that even before the arbitration, U.S. Government engineers confirmed Honduras owed DRC tens of millions of U.S. Dollars, and that later claims of fraud are contradicted by the U.S. Government's own findings. The modified

total cost claim referenced by the USACE was later recognized by the arbitration tribunal on September 7, 2009.

40.    On May 10, 2005, USAID issued Implementation Letter No. 190/135 reallocating One Hundred Thousand ($100,000.00) U.S. Dollars in obligated funds from DRC's Group I contract (Exhibit 14) to FHIS directly. The $100,000.00 was expressly committed to pay FHIS' legal expenses in the arbitration against DRC. This meant USAID directly financed Honduras' legal defense against a U.S. Contractor using the Contractor's own project funds — money that had already been earned and obligated under the Contract, but unpaid to DRC. Such diversion of obligated Contract funds constitutes a misappropriation and fraud by USAID, violating U.S. law and the Special Objective Grant Agreement. This action not only stripped DRC of funds rightfully due but also armed FHIS with U.S. taxpayer money to fight the very contractor USAID had assisted in engaging to perform the life-saving construction projects.

This letter is documented evidence of continued criminal misconduct by USAID. Once project funds are obligated and earned by a Contractor, they cannot lawfully be reprogrammed to finance the opposing party's legal defense. This was not just an accounting maneuver; it was a criminal diversion of funds already obligated and earned by DRC and still to this date, some twenty (20) years later, unpaid to DRC. Once U.S. taxpayer funds are obligated to a Contractor under a valid contract, those funds cannot be reprogrammed for a different use without first being de-obligated (e.g., through contract modification or termination) and must still comply with appropriations law. USAID's act constitutes fraud upon the Contractor and upon the U.S. Congress, weaponizing taxpayer dollars against a U.S. company.

41.    On May 19, 2005, USAID's Office of Inspector General (OIG) obtained a federal search warrant against DRC, Inc.'s headquarters in Mobile, Alabama (Exhibit 15). USAID

agents executed the warrant on May 19–20, 2005, seizing computers, hard drives, over 200 boxes of accounting records, attorney-client privileged documents, and over 5,000 pounds of files from DRC's offices. These documents had been accumulated by DRC to prosecute its claims for reimbursement of the funds due DRC for the work performed. Upon return, after the case was dismissed, these records were used by DRC to successfully prosecute the matter before the arbitration panel in Honduras.

This extraordinary action was not the result of any private complaint but was initiated directly by USAID itself to justify not paying FHIS debts, further showing USAID's corrupt retaliatory campaign against DRC after it reported bribery demands by FHIS and USAID officials. Ultimately, no charges were filed, and in March 2007 the U.S. Attorney's Office for the Southern District of Alabama issued a formal declination letter confirming that it would not pursue any prosecution and returned all of DRC's documents.

The 2005 raid is documented evidence of USAID's abuse of power: an American contractor that had successfully completed life-saving projects was treated like a criminal organization by its own Government, despite the absence of any fraud and because it had the guts and temerity to report repeated bribery demands by U.S. and Honduran citizens and Government employees. This misuse of prosecutorial tools served Honduras' political interests and obstructed DRC's lawful contract rights.

42.    On March 23, 2007, the U.S. Attorney's Office for the Southern District of Alabama issued a letter confirming that it was "declining further investigation and prosecution" of the alleged criminal matter for DRC in Honduras. Honduran prosecutors likewise closed the matter without charges.  (Exhibit 11)

43. On September 7, 2009, (Exhibit 16) DRC, after almost a year of discovery and hearings before a three (3) judge Honduran Arbitration Panel, was awarded a Final Order against FHIS and the GOH . This order was not appealed in Honduras and therefore became final and binding under Honduran law, arbitration law, and the U.S.–Honduras treaties, including the 1961 Bilateral Agreement and the 1999 Special Objective Grant Agreement**,** which required payment by Honduras with the right to seek reimbursement from USAID.

DRC's claim before the arbitration panel was a Modified Total Cost Claim, what DRC spent on the project plus profit and interest, which is exactly what the USACE analysis recommended. Under this doctrine, when a Contractor cannot segregate damages item by item because of pervasive owner interference, defective specifications, and cumulative disruption, the law allows the Contractor to recover its total actual costs of performance, adjusted for any amounts already paid, plus reasonable profit. In other words, the Honduran Arbitration Panel reviewed what DRC actually spent to complete the projects and awarded those costs plus interest and legal fees.

44. On November 7, 2009, FHIS certified the arbitration award for payment and requested USAID to pay (Exhibit 17). Plaintiffs have no record of USAID response. The donation treaties are valid and enforcement upon USAID is at the discretion of FHIS and Honduras. DRC does not have privy of contract to act on behalf of Honduras and collect on Honduras behalf. The spirit of the agreements was that USAID would pay but spirit and good faith are not part of U.S. government contracting, either you have privy of contract to sue, or you don't.  Honduras has privy of contract with USAID, DRC does not!

45. On January 5, 2010, DRC filed *Civil Action No. 10-0003* in Federal District Court in Washington, D.C. to confirm the Arbitration Award against the GOH  for Fifty-One Million Four Hundred Eighty-Two Thousand Five Hundred Fifty-Six and 09/00 ($51,482,556.09) U.S. Dollars

plus interest, damages and fees. (Exhibit 18) Honduras President Porfirio Lobo Sosa (aka Pepe Lobo[11]) publicly swore to bullet proof the Republic of Honduras against this suit and he personally ordered criminal investigations and threatened all judges and attorneys who sue or participate with jail. (Exhibit 20)

46. On October 23, 2014, *Civil Action No. 10-0003 (PLF)* Federal District Judge dismissed DRC's petition to confirm the Arbitration Award due to arguments presented by Honduras that the Government was not liable for the debts of FHIS, (Exhibit 19) as FHIS was fraudulently alleged to not be part of the GOH . Therefore, the GOH  was awarded sovereign immunity from DRC's collection case because FHIS allegedly could not waive the immunity of Honduras. This decision was induced by fraudulent affidavits submitted by FHIS and its attorneys. The Attorney for Honduras presented affidavits of Honduran Engineer Juan Urquiza (exhibit 21), Honduras Attorney Luis Enrique Galeano Milla (Exhibit 22) and Honduras Attorney Julio Rendon Cano (Exhibit 23) who all swore under oath that FHIS is not part of the GOH  therefore the government is not liable for the debts of FHIS.

47.    In 2016 the United States continued to treat the FHIS as a Honduran Government implementing arm and paid approximately One Hundred Seventy Four Thousand Three Hundred ($174,300.00) U.S. Dollars for a formal assessment after the U. S. District Court decision and Honduras' representations thereof that FHIS was not an Agency of the Republic of Honduras. USAID awarded a contract to International Business Initiatives Corporation to perform a "public

---

[11] Former Honduran President Porfirio "Pepe" Lobo Sosa was barred from entry into the United States in 2021 after the U.S. Department of State determined he had engaged in significant corruption, including accepting bribes from the narco-trafficking organization *Los Cachiros* in exchange for political favors, thereby undermining democratic institutions. His family has also been implicated in narcotics and violent crime: his son Fabio Lobo was arrested in 2015 and in 2017 was convicted in the U.S. Southern District of New York for conspiring to import cocaine into the United States, receiving a 24-year sentence; another son, Said Omar Lobo Bonilla, was killed on July 14, 2022 in an execution-style attack outside a nightclub in Tegucigalpa, amid the country's ongoing wave of drug-related violence.

financial management risk assessment of FHIS, the Honduran Social Investment Fund," expressly to determine the Fund's eligibility for government-to-government financing. The contracting record shows approximately One Hundred Seventy-Four Thousand Three Hundred ($174,300.00) U.S. Dollars was obligated for this study. (Exhibit 59)

Notwithstanding positions taken in prior United States litigation claiming that FHIS was not the Honduran government, Plaintiff alleges that maintaining contrary representations to United States and the public—while commissioning and paying for this assessment—constitutes fraud on and a continuing deception of the American public by USAID, the Republic of Honduras and FHIS.

48.    On April 19, 2017, PLAINTIFF FARMER reported fraud and theft by Honduras and USAID to the Office of the Inspector General of the USAID. This put USAID on notice that FHIS was pretending to be the GOH  to be eligible for U.S. funding, that it was allegedly not eligible for. Despite that notice and the report of fraud and theft, the Inspector General did not provide any substantive response or apparent corrective action. (Exhibit 60)

49.    On October 10, 2017, in *Farmer v. Republic of Honduras and USAID*, Case No. 1:17-cv-00470-KD-N (S.D. Ala.), PLAINTIFF FARMER filed a False Claims Act whistleblower suit for damages exceeding One Hundred Million ($100,000,000.00) U.S. Dollars, alleging that Honduras and USAID colluded to fraudulently represent FHIS as a government ministry ineligible for U.S. Government-to-Government funding. By inducing DRC and others into contracts under this false premise that FHIS was an agency of the Republic of Honduras and therefore eligible for USAID funding, Defendants unlawfully accessed U.S. Congressional funds earmarked for Honduras only. (Exhibit 24) If FHIS was not part of the Honduran government, it was ineligible for such donations.

50. On March 11, 2019, the False Claims Act case was unsealed and served upon FHIS, Honduras and USAID. (Exhibit 25)

51. On August 9, 2019, Honduran contractor Nacional Ingenieros, S.A. (NAINSA) filed a complaint in the Honduran Courts to enforce the final, binding arbitration award, also raising allegations of fraud by the GOH . (Exhibit 26)

52. On January 23, 2020, PLAINTIFF FARMER submitted a Supplemental Brief in the U.S. False Claims case, detailing how Honduras, acting through FHIS and in collusion with USAID, knowingly misrepresented FHIS as a Honduran Government Ministry. (Exhibit 27) Plaintiffs showed that Honduras fraudulently induced USAID to disburse hundreds of millions of dollars under false pretenses, diverted funds to cover legal defenses, and refused to pay DRC despite certified obligations. The brief established deliberate misconduct, material misrepresentations, and damages exceeding $100 million, while USAID engaged in arbitrary and capricious acts to shield Honduras and itself.

53. On February 24, 2020, only one month after PLAINTIFF FARMER filed the Supplemental Brief, the GOH  issued Executive Order No. 17-2020, expressly acknowledging the Honduran Government's liability for the FHIS debts and directing the Procuraduria General de la Republica  (PGR) to negotiate a settlement of the arbitration award with Nacional Ingenieros, S.A. (NAINSA). (Exhibit 28) This order was no coincidence — it was a direct response to PLAINTIFF FARMER's exposure of Honduras's fraud before U.S. Courts.

54.   In 2021, NAINSA reached a settlement agreement with the GOH  and was paid in full.

55.   On January 5, 2022, PLAINTIFF DRC filed a collection complaint in Honduras (Exhibit 29). The Democratic Socialist LIBRE Party Attorney General PGR (defined page one of

Complaint) who was served, filed an appearance in the Court but never filed a written opposition nor attended a hearing.

On February 2, 2022, the National Congress of Honduras unlawfully appointed and swore in DEFENDANT GALEAS as Attorney General PGR, despite two reported fatal defects: (i) the incumbent officials' term remained valid until June 29, 2022, under Decrees 70-2018 and 91-2019; and (ii) the appointee failed to satisfy the constitutional requirement of being a duly authorized Notary, as mandated by Articles 229 and 309 of the Honduran Constitution. (Exhibit 65)[12].

These acts, if correct, represent a direct and unequivocal violation of the Honduran Constitution by Democratic Socialist LIBRE Speaker of the House Luis Redondo[13] Guifarro and constitute the crime of unlawful assumption of public office under Article 500 of the Penal Code. Summer and Fall of 2022, the Honduran Civil Court of Letters held at least three (3) hearings to consider confirmation of the PLAINTIFF DRC'S Arbitration Judgment and the Executive Order No. 17-2020 issued on February 24, 2020 and Collection Complaint filed January 5, 2022.

56. On September 6, 2022, due to refusal of the PGR to attend the hearings, the Plaintiffs filed a Complaint before the United Nations Commission on Human Rights. The Honduran Judiciary (Civil Court of Letters) entered a Default Judgment for One Hundred Six Million Two Hundred Six Thousand Four Hundred Sixty and 51/100 ($106,206,460.51) U.S. Dollars against the Republic of Honduras in favor of DRC. After at least three (3) rescheduled hearings, the

---

[12] The Anti-Corruption Counsel Report and Criminal Complaint dated Report ("CNA") dated January 23, 2023 (Exhibit 65)

[13] The Socialist Speaker of the Honduran Congress is Luis Redondo. His mistress states that he is a criminal who trafficked her while pregnant with his child to the U.S. to avoid a political scandal during the Biden administration. He allegedly hired a coyote and trafficked her five months pregnant into the United States so their child could be born in the United States. Sadly, he is in charge of writing Honduras' laws and yet he apparently flagrantly violated U.S. laws. Honduras does not have Birth Right Citizenship, yet their top lawmaker apparently took advantage of the U.S. Birthright Citizenship by allegedly shipping his mistress though use of a coyote into the United States. He has been sued in Virginia for child support.

Attorney General's Office (PGR) filed no opposition and did not appear to defend the State (Exhibit 30). The final hearing and Judgment issuance was attended by a United Nations Human Rights Investigator, Augusto Cesar Martinez Arriaga. Multiple attorneys of the PGR were present for the hearing, were not the attorneys of record and refused to make an appearance in the case.

57.     On September 16, 2022, the ten (10) day statutory deadline under Honduran law for the PGR to appeal the September 6, 2022 Final Judgment expired. The Attorney General's Office failed to file any Appeal within the prescribed period and has in fact never filed an Appeal— not even an untimely one. As a result, the Final Judgment in favor of DRC for the amount of One Hundred Six Million, Two Hundred Six Thousand, Four Hundred Sixty and 51/100 ($106,206,460.51) U.S. Dollars became "final, binding, and non-appealable" under Honduran law, as specifically later described by the Honduran Supreme Court.

58.     On October 14, 2022, the PGR of Honduras through Defendant GALEAS (the Attorney General), sent an ex parte letter (Oficio No. 229-D-PGR-2022) (Exhibit 31) to Rebeca Santos, President of the Central Bank, ordering her not to comply with the Final and Unappealable Payment Order in favor of DRC. The letter falsely declared the judgment "null and void," threatened bank officials with criminal liability for compliance, and was issued without notice to Plaintiffs in violation of Honduran law. This act of ex parte collusion obstructed enforcement of a lawful Supreme Court judgment, intimidated a U.S. contractor, and formed part of DEFENDANTS' broader retaliatory campaign that constitutes international terrorism under 18 U.S.C. § 2331.56.

59. On December 5, 2022, The Constitutional Appeal filed by the PGR of Honduras of the September 6th Judgment by the Second Court of Appeals was rejected because the ten (10) day opposition prerequisite appeal was not timely filed. (Exhibit 32)

60.     On January 11, 2023, the Honduran Supreme Court (Civil Chamber) unanimously issued an Ad Effectum Videndi[14] (case number SCO-059-2023) (Exhibit 33) Order finding no defects and expressly upholding the September 6, 2022, Judgment and Payment Order as "final and unappealable". The Honduran Supreme Court reviewed all actions of the September 6, 2022, Final Judgment and issued their ruling finding:

> "The Supreme Court of Justice, through its Civil Chamber, ruling unanimously and administering justice in the name of the State of Honduras, hereby issues this <u>final and unappealable order</u> (emphasis added), and resolves: NO OBSERVATIONS regarding the ad effectum videndi petition submitted by (DEFENDANT) GALEAS, acting as PGR of the Republic. ORDERS that a certified copy of this resolution be sent to the Civil Trial Court of Francisco Morazán and to the Second Civil Court of Appeals of Francisco Morazán, for their information. This ruling is issued on the date indicated due to the complexity of the matter. COMPLY ACCORDINGLY."

61.     On January 25, 2023, DEFENDANT GALEAS, the Attorney General, sent another ex parte letter (Oficio No. 013-D-PGR-2023) (Exhibit 34) to Rebeca Santos, President of the Central Bank, again ordering noncompliance with the Final and Unappealable Order in favor of DRC. The letter alleged "innumerable violations of due process," denied the judgment's finality, and threatened bank officials with criminal consequences if they executed the embargo. Like the October 14, 2022 letter, this ex parte communication, made outside judicial proceedings and without notice to Plaintiffs, constitutes Abuse of Power and further evidences the terrorism campaign against Plaintiffs by obstructing enforcement of a lawful judgment owed to a U.S. citizen contractor.59. On January 26, 2023, DEFENDANT GALEAS, Attorney General,  through his office of the PGR improperly filed yet another *ad effectum videndi* case number SCO-0107-2023 (Exhibit 35) motion before the Constitutional Chamber of the Honduran Supreme Court, even

---

[14] An *ad effectum vivendi* is a provisional order under Honduran constitutional procedure that temporarily suspends the enforcement of a judgment while a related constitutional challenge (such as an *amparo*) is reviewed. By law, the Constitutional Chamber must resolve such petitions within 62 hours of filing. The measure does not alter or nullify the underlying Judgment; it merely delays execution on an emergency basis.

though the Civil Chamber of the same Court had already ruled on January 11, 2023 on the exact and identical *ad effectum videndi* and issued an order confirming the finality of Plaintiffs' judgment, calling it a "Final and Unappealable Order". This duplicative filing was procedurally improper under Honduran law and served no legitimate purpose other than to delay and obstruct enforcement of the Honduran Supreme Court's $106,206,460.51 "Final and Unappealable Order".

62.    On January 27, 2023, The Civil Court of Letters issued a Payment Order in favor of DRC to the Central Bank of Honduras (BCH), which is an Order to make payment to PLAINTIFF DRC, under Honduran Law for the full One Hundred Six Million Two Hundred Six Thousand Four Hundred Sixty and 51/100 ($106,206,460.51) U.S. Dollars. (Exhibit 36) On January 28, 2023, PLAINTIFF FARMER and a team of attorneys accompanied the Court Bailiff to deliver the Payment Order to the Central Bank of Honduras, as is customary in Honduras. PLAINTIFF FARMER and attorneys returned with the Court Bailiff on January 31, 2023, February 1, 2 and 3, 2023, as the BCH continued, without explanation saying they were going to fund the Payment Order but continued to refuse to do so.

63.    On January 30, 2023, DEFENDANT GALEAS, the Attorney General, sent a third ex parte letter (Oficio No. 017-D-PGR-2023) (Exhibit 37) to Rebeca Santos, President of the Central Bank, again ordering noncompliance with the Payment Order in favor of PLAINTIFF DRC. He denounced the Order as "arbitrary," claimed it would cause "irreparable damage," reiterated the alleged inability to lien public funds, and reported criminal denunciations against judges who attempted to enforce the Final and Unappealable Order. Like the prior letters, this ex parte act, made outside judicial process and without notice to Plaintiffs, constitutes Abuse of Power and further evidences the terrorism campaign by criminalizing compliance with a lawful Supreme Court Final and Unappealable Order owed to a U.S. corporation

64. On or about February 3, 2023, DEFENDANT MONCADA, prior to her televised statements in subparagraph Paragraph 64 below, claimed that she had been approached by a DRC attorney, who allegedly told her and the President of the Central Bank that there existed a Judgment of approximately 3 billion lempiras (One Hundred Six Million Two Hundred Six Thousand Four Hundred Sixty and 51/100 ($106,206,460.51) U.S. Dollars), which was final and binding with the authority of res judicata. In addition, the Attorney warned that failure to comply would result in prison. (Exhibit 67)

"A lawyer came to threaten the President of the Central Bank and also the Minister of Finance (Defendant Rixi Moncada) with a judgment of the courts and said: *'This is a judgment. It orders the State to pay 3 billion. It is final and has the authority of res judicata (final binding unappealable judgment). If you don't comply, then you will go to prison.* And what are required to do with the judgment*? Make a wire transfer of 3 billion to a public–private corruption network that, together with judges and prosecutors, managed to condemn the State to pay 3 billion.*

And we said: *'Wait a minute. We are not going to pay a corrupt judgment. We are going to report this public–private corruption. Take your judgment away, because we are going to accuse the judge, the prosecutor, and the network of lawyers who are trying to rip us off.'*

65. On February 3, 2023, while PLAINTIFF FARMER and attorneys were in the BCH accompanied by the Court Bailiff, the DEFENDANTS MONCADA and GALEAS convened a nationally televised press conference in Tegucigalpa, Honduras, during which they made coordinated and defamatory remarks about PLAINTIFF FARMER, accusing him of corruption and fraudulent manipulation of the Honduran legal system. (Exhibit 38) After the press conference convened, PLAINTIFF FARMER and Attorneys were informed the BCH was closing early and asked them to leave.

66. In the press conference DEFENDANT MONCADA declared: *"Yo me hago personalmente responsable de no entregar ni un tan solo lempira…"* (Translation *"I make myself*

[15]*personally responsible to not deliver one single Lempira...*}*...")* She went further, describing PLAINTIFF FARMER as a legal predator and enemy of the Honduran people who had defrauded the State. DEFENDANT MONCADA waived all Defendants' foreign sovereign immunity[16] when she expressly deemed all defendants personally responsible acting outside their official duties. DEFENDANT MONCADA intentionally defied the binding obligations of the 1999 Special Objective Grant Agreement and the 1961 Bilateral Agreement, knowing such refusal to pay a U.S. Contractor was both a treaty breach and a direct injury to a U.S. corporation and a U.S. national in the United States.

67.    DEFENDANT GALAES, the Attorney General, in his personal capacity, reinforced these accusations and implied that the "Final and Unappealable Order", as defined by the Honduran Supreme Court itself, was the product of bribery, fraud, or undue influence, casting aspersions on both Plaintiffs' reputation and the integrity of the Honduran judiciary. DEFENDANT GALEAS further reinforced these accusations and stated:

> *"Denunciamos la existencia de una red de corrupción público-privada que, a través de una sentencia espuria, condenó al Estado ... hemos decidido no entregar ni un solo lempira de la Caja Única del Tesoro."*
> (*Translation: "We denounce the existence of a public-private corruption network which, through a fraudulent ruling, condemned the State ... we have decided not to deliver even a single lempira from the Unified Treasury Account."*)

---

[16] In **Samantar v. Yousuf, 560 U.S. 305 (2010)**, the Supreme Court held that the Foreign Sovereign Immunities Act (FSIA) does not automatically shield foreign officials from liability for acts committed outside the scope of their lawful authority. The Court emphasized that individual officials may be held personally liable when they engage in conduct that is ultra vires, criminal, or otherwise not attributable to the sovereign itself. This principle applies here: DEFENDANTS MONCADA, GALEAS, ZELAYA, SANTOS, and CHIRINOS acted outside any legitimate sovereign function by issuing defamatory statements, fabricating criminal prosecutions, threatening bank officials and judges with jail for complying with lawful orders, and obstructing a Final and Unappealable Judgment. These were not sovereign acts, but personal misconduct carried out under color of office, and therefore fall outside FSIA immunity.

He thereby implied that the "Final and Unappealable Order" of the Honduran Supreme Court was fraudulent and obtained through corruption, casting aspersions on both Plaintiffs' reputation and the integrity of the Honduran judiciary.

68.    The press conference was streamed live across major television networks and instantly disseminated online. It was viewed within hours by PLAINTIFF FARMER's family, legal team, investors, and business associates in Mobile, Alabama. The broadcast, translated and subtitled, quickly went viral among Spanish and English-speaking audiences.

69.    On the eve of February 3, 2023, and in response to the Defendants' press conference, the Supreme Court of Honduras issued a press release stating (Exhibit 39):

**"PRESS RELEASE**

FEBRUARY 3, 2023

THE ATTORNEY GENERAL'S OFFICE DID NOT FILE AN APPEAL, THEREBY ACCEPTING THE ACTIONS RESULTING FROM THE LAWSUIT

In response to the public statement issued today by the Government of the Republic—through the Minister of Finance, the head of the Central Bank of Honduras, and the Office of the PGR of the Republic (PGR)—which alleged the existence of "public-private corruption networks using the judicial sector," the Judiciary of Honduras, for the benefit of both national and international public opinion, clarifies the following:

1. The lawsuit mentioned in the public statement resulted in a compulsory enforcement Judgment amounting to approximately 2.6 billion Lempiras against the State of Honduras. The case has followed appropriate legal proceedings at each stage through the relevant judicial bodies. The public statement that the Government is using this situation as a mechanism to defend serious errors committed by the Attorney General's Office during this legal process is not in any way shared or endorsed by this Judicial Branch.

2. One of the serious errors committed by the PGR was failing to timely file an appeal with the appropriate Court of First Instance, an action they later attempted to remedy through the filing of a writ of Amparo[17] with the Second Court of

---

[17] An amparo is a constitutional appeal in Honduran law, designed solely to protect the fundamental rights of individuals against acts of authority; it does not extend to the State or its institutions.

Appeals for Civil Matters of Francisco Morazán, without having exhausted the required procedural steps in the lower court.

3. According to the Law on Constitutional Justice, Article 46, which lists the grounds for inadmissibility of an Amparo action, the Court of Appeals unanimously held that the PGR violated the criteria for admissibility by: (1) "failing to allege violations of clear and current law," and (3) "when the actions were consented to by the aggrieved party." It is understood that consent occurs when available legal remedies are not exercised within the legal timeframes, thus making further appeals impossible. (The PGR did not appeal the ruling, which is a legal prerequisite for subsequently filing an Amparo.)

4. Likewise, the PGR, representing the State, requested the aforementioned Court of Appeals for a "Mandatory Consultation" seeking to invalidate the content of the final Judgment rendered by the Constitutional Court. The Court clarified that: "A final ruling issued by the Constitutional Chamber or its divisions is not subject to mandatory consultation before the relevant Court of Appeals," thereby affirming the principle of finality, a cornerstone of legal certainty and constitutional legitimacy. The dismissal order is not a decision on the merits, precedent is well established in Honduran jurisprudence and is upheld by all Courts of Appeals in the country. This is recorded in the following cases, among others: File Nos. AC-152-2019 / APC 676-2021.

5. Although the Attorney General's Office (PGR) submitted a written objection to the ruling by the Court of First Instance (Juez de Letras) ordering the enforcement of the seizure, the representative of that office failed to appear at the corresponding hearing. That hearing was rescheduled by the judge on three separate occasions, without the representative justifying their absence. According to the Civil Procedure Code, this constitutes abandonment of the objection. On that same day, the PGR was notified of the ruling, and pursuant to Article 709 of the same code, from that moment, it had ten days to file the corresponding appeal, which it failed to do within the legal time limit. Is this not a negligent act in regard to the interests of the State?

6. As a result, the inexcusable omission by the PGR in failing to pursue its objection to the precautionary measure of seizure, and in failing to file an appeal against the ruling that imposed said measure, constitutes, procedurally speaking, acquiescence to the court's decision, which clearly harms the financial interests of the State.

7. We consider the claims made in the public statement to be extremely unfortunate, as they aim to discredit the work of the Supreme Court of Justice with unfounded accusations. Nonetheless, we support the public call for the Public Prosecutor's Office to conduct a prompt and thorough official investigation, directed at any State official, regardless of rank or location— whether inside or outside the country—to determine, with appropriate evidentiary support, the responsibility of those accused in the government's public statement. JUDICIARY POWER OF HONDURAS"

70.  In the days/months/years that followed, PLAINTIFF FARMER received a wave of online threats, including direct messages referencing *William Walker*, a 19th-century American Pirate executed in Central America. Social media users wrote: *"Paul FARMER if you don't leave our country in the next 24 hours you will get the William walker (sic) treatment,"* and *"we are not giving you a dime nigga. Get the fuck out of our country or you will end up like the pirate William Walker Look it up."*

71.    These threats were not random. They were incited directly by the Defendants' rhetoric and by DEFENDANT MONCADA 's repeated framing of PLAINTIFF FARMER as a colonial infiltrator and a threat to national sovereignty. Such threats constitute violations of 18 U.S.C. § 875(c) (interstate/foreign threats), 18 U.S.C. § 2332(b) (acts against U.S. nationals abroad), and 18 U.S.C. § 2339A (material support to terrorism), all of which meet the statutory definition of "international terrorism" when combined with Defendants' intent and conduct. (Exhibit 40)

72.    The personal and professional consequences to Plaintiffs in Alabama were immediate and devastating. Business deals collapsed.  Reputational standing was destroyed. Family safety was threatened. Emotional distress was constant. Defendants' coordinated actions had foreseeable and intended consequences in the Southern District of Alabama. Plaintiffs' estimated financial losses exceed Twenty-Five Million ($25,000,000.00) U.S. Dollars in disrupted transactions, lost contracts, and diminished corporate value in Alabama alone.

73.    On February 17, 2023, a new Supreme Court of Honduras was named by the Honduran Congress. The Democratic Socialist (LIBRE) party took the majority for first time in

Honduras' history. The Democratic Socialist Magistrate Sonia Marlina[18] Dubon was named to the Court and named Chief Judge of the Constitutional Chamber.

74.    On February 20, 2023, the Banco Central de Honduras (BCH) issued letter JUR-0370/2023 (Exhibit 41) to Magistrate Sonia Marlina Dubón Villeda of the Constitutional Chamber, confirming that although the Final and Unappealable Order to guarantee payment in favor of DRC had been formally ordered and executed on January 25, 2023. DEFENDANT GALEAS, the Attorney General, repeatedly instructed the BCH not to comply. The BCH detailed that the DEFENDANT GALEAS sent multiple ex parte communications — including Oficios 229-D-PGR-2022, 013-D-PGR-2023, and 017-D-PGR-2023 — warning that compliance would expose the BCH to liability and potential criminal consequences.

This BCH ex parte communication is documented evidence of the terrorism campaign: it proves that DEFENDANT GALEAS threatened both the Central Bank and the judiciary with criminal prosecution for obeying a lawful Court Order, thereby criminalizing compliance and institutionalizing obstruction against Plaintiffs. DEFENDANT GALEAS is obstructing the execution of the Court Order he himself did not oppose or even appeal.

75.    On March 3, 2023, the newly appointed Democratic Socialist Magistrate and recipient of the U.S. Engel list designation for anti-democratic, anti U.S. actions in Honduras named Sonia Marlina Dubon accepted the Amparo[19] appeals that were denied on December 12,

---

[18] The Democratic Socialist Judge Sonia Marlina Dubón Villeda has been designated by the U.S. Department of State on the Engel List, a sanctions tool created under Section 353 of the United States–Northern Triangle Enhanced Engagement Act (P.L. 116-260, Div. FF, Title III, §353). The Engel List identifies foreign officials involved in significant corruption, the obstruction of democratic processes, or the undermining of the rule of law in El Salvador, Guatemala, and Honduras, and can trigger visa cancellations, asset freezes, and restrictions on access to the U.S. financial system.

[19] The amparo (constitutional appeal) filed by the State is unlawful, as only natural persons are endowed with constitutional rights. The government has no constitutional rights and therefore lacks standing—just as a corporation has no human rights, and the U.S. Government cannot claim protections under the Bill of Rights.

2022, thus suspending DRC collections indefinitely and to this date. The previously denied appeals dated December 5, 2022, the Ad Effectum Vivendi of January 11, 2023, were final and binding per Honduran law prior to her illegally accepting these illegal appeals. (Exhibit 43)

76.     On January 10, 2024, Case No. 1:17cv00470-KD-N False Claims Act Case Farmer vs Honduras/USAID the U.S. Governments motion to dismiss based on comity, which was granted, went to the Eleventh Circuit U.S. Court of Appeals, and was ultimately dismissed because President Biden's U.S. Attorney withdrew the case against FARMER's (Relator) opposition. The U.S. Supreme Court has ruled that the U.S. Attorney does not need relators' consent to withdraw a False Claims Case[20].  The case of USAID-Honduras Fraud under U.S. Procurement and Fraud upon the courts was not heard on the merits. (Exhibit 44)

77.      On February 27, 2025, The Honduran Supreme Court held a closed session hearing deciding all the appeals filed by the PGR on March 3, 2023, in DRC's favor; unanimously, including Magistrate Sonia Marlina Dubon, denying each and all of them (Exhibit 45). To date this Order has not been issued, again in clear violation of Honduran law.

78.     On May 9, 2025, PLAINTIFF FARMER filed a formal complaint with the Federal Bureau of Investigation (FBI), detailing this campaign of incitement, defamation, obstruction, and terroristic retaliation carried out by Defendants both personally and under the color of office. (Exhibit 48)

79.     On May 13, 2025, PLAINTIFF FARMER filed a complaint before the Inter-American Commission on Human Rights for the actions stated herein. (Exhibit 49)

---

[20] United States ex rel. Polansky v. Executive Health Resources, Inc.**,** 599 U.S. 419 (2023)

80.    On May 19, 2025, PLAINTIFF FARMER filed an Engel list designation request, visa cancellation request and a Magnitsky [21] sanctions request against DEFENDANTS MONCADA and GALEAS before the Department of State, Chair of the Western Hemisphere Committee and the U.S. Embassy in Tegucigalpa, Honduras. (Exhibit 49)

81.    On May 21, 2025, PLAINTIFF FARMER sent an assistance request of corruption by foreign Government to Senator Tommy Tuberville, Senator Katie Britt, Congressman Shomari Figures, and Congresswoman Maria Salazar (Chair of Western Hemisphere Committee) for assistance with the corrupt Democratic Socialist GOH . (Exhibit 50)

82.    On July 28, 2025, DEFENDANTS GALEAS, ZELAYA, SANTOS, and CHIRINOS commenced a public criminal prosecution against PLAINTIFF FARMER. This accusation was issued by a press statement (Exhibit 4), centered on the false allegation that the twenty-one (21) potable water and sewer projects built by DRC for more than 300,000 desperate Hondurans some 20-25 years ago had never been constructed, were suspended, and never existed, and that the Judgment collection itself was fraudulent. These claims are patently false—more than two decades earlier USAID, USACE, RECAPS, DIM, and the relevant municipal authorities all certified the projects as fully completed to contractual satisfaction.  In addition, these desperately needed, and lifesaving facilities have been continuously used by hundreds of thousands of Hondurans, by now possibly millions of the poorest Hondurans for sanitary and life-giving services for over some twenty years. The prosecution, brought some twenty years after the fact, constitutes political persecution in retaliation for Plaintiffs' lawful efforts to collect on the "Final

---

[21] The Global Magnitsky Human Rights Accountability Act, Pub. L. 114-328, Title XII, § 1261 et seq. (codified at 22 U.S.C. § 2656 note), authorizes the President to impose targeted sanctions—including asset blocking and visa bans—on foreign persons involved in significant corruption or serious human rights abuse. It is implemented through Executive Order 13818 (Dec. 20, 2017), administered by the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC).

and Unappealable Order", and was initiated without prior citation, notification, or opportunity to be heard, in violation of Honduran law requiring that an accused be summoned and permitted to present evidence before any formal accusation (*audiencia de descargo*). By bypassing this Due Process safeguard and issuing an arrest warrant outright and by charging obviously fraudulent charges which are over twenty (20) years old (with a ten-year Statute of Limitations in Honduras), Defendants unlawfully and in concert, manipulated the Honduran legal system as an instrument of retaliatory persecution. Defendants clearly and conspiratorially weaponized the Honduran legal system as a tool of retaliation. PLAINTIFF FARMER narrowly escaped this persecution by fleeing over several days through the Honduran rainforest to El Salvador. The charges are also barred by the ten (10) year Statute of Limitations under Honduran law and directly prohibited by the 1961 U.S.–Honduras Bilateral Agreement and the 1999 Special Objective Grant Agreement, both of which immunize U.S. contractors from Honduran criminal jurisdiction for acts performed within the scope of USAID-funded projects. This deliberate misuse of prosecutorial authority—designed to intimidate, coerce, blackmail and endanger a U.S. citizen abroad—constitutes an act of international terrorism under 18 U.S.C. § 2331, as it involved acts dangerous to human life, violated U.S. criminal laws, and was intended to retaliate against and intimidate a U.S. Citizen.

> "Article IV of the 1961 Bilateral Agreement requires Honduras to recognize U.S. personnel and contractors engaged in technical cooperation as having privileges and immunities equivalent to diplomatic agents, immunizing them from Honduran criminal jurisdiction for acts performed under USAID-funded programs."
> "The 1999 Special Objective Grant Agreement (SOAG) expressly obligated Honduras to honor arbitral awards and judicial rulings arising from USAID-funded projects and provided that contractors such as DRC would be indemnified against losses.

83.    Additionally, the July 28, 2025, criminal prosecution initiated by DEFENDANTS GALEAS, ZELAYA, SANTOS, and CHIRINOS was not only false and time-barred but

also unlawful under Honduran law itself. The Code of Civil Procedure (*Código Procesal Penal de Honduras* ("CPPH")) and the Constitution require that no person may be subjected to criminal[22] prosecution without prior notice, citation, and an opportunity to present evidence before a formal accusation (*requerimiento fiscal*) is filed. Further these alleged acts are far outside the Honduran ten (10) year Statute of Limitations.

- Artículo 1 CPPH – Juicio Previo (Principle of Prior Trial):
  *"Nadie podrá ser condenado a pena alguna, sino en virtud de sentencia firme, dictada por juez o tribunal competente, con las formalidades y requisitos establecidos por la ley."*
  Translation: "No one may be sentenced to any penalty except by virtue of a final Judgment issued by a competent judge or tribunal, in accordance with the formalities and requirements established by law."
- Artículo 2 CPPH – Estado de Inocencia (Presumption of Innocence):
  *"Toda persona imputada de delito se presume inocente y debe ser tratada como tal mientras no se declare su responsabilidad mediante sentencia firme."*
  Translation: "Every person accused of a crime is presumed innocent and must be treated as such until their responsibility is declared by a final judgment."
- Artículo 294 CPPH – Audiencia Inicial (Initial Hearing):
  *"El imputado deberá ser citado para la audiencia inicial, en la cual se le informará detalladamente de los cargos formulados, se le permitirá responder y presentar pruebas en su descargo, y ejercer plenamente su derecho de defensa antes de que el juez resuelva sobre la apertura a juicio."*
  Translation: "The accused must be summoned to the initial hearing, where they will be informed in detail of the charges, permitted to respond and present evidence in their defense, and exercise their full right to defense before the judge rules on the opening of trial."

84.    Defendants intentionally ignored these binding provisions and skipped the preliminary hearing entirely, issuing an arrest warrant against PLAINTIFF FARMER by press

---

[22] Under Honduran criminal procedure, there is a critical distinction between ordinary crimes and so-called "white collar" or economic crimes. For economic crimes such as fraud, corruption, or misuse of funds, the Código Procesal Penal de Honduras (CPPH) requires that the accused be given a preliminary hearing (opportunity to respond) before a formal arrest warrant may be issued. This safeguard reflects the due process principle that financial or contractual disputes must first be heard and defended in an adversarial hearing, rather than by immediate arrest. By skipping this mandatory hearing and issuing an arrest warrant by press release, Defendants ignored Honduran law and deprived PLAINTIFF FARMER of the fundamental protections expressly required in economic-crime cases.

release without any prior citation, notice, or opportunity to respond. This was not accidental — it was a deliberate omission by officials of a hostile, anti-American regime acting as an enemy country. All of the individuals accused were sent to Tamara Prison. Tamara is infamous for overcrowding, corruption, and extreme violence. It houses some of the most violent gang members in Central America, including leaders of MS-13 and 18th Street Gang, who operate criminal enterprises from inside the prison with impunity. Human rights reports describe Tamara as a facility controlled by organized crime, where killings, torture, extortion, and sexual violence are common, and state protection is absent. (Exhibit 4)

85.    This misconduct occurred in a broader pattern of anti-American hostility. DEFENDANT MONCADA, in multiple public speeches and interviews, made statements declaring her opposition to U.S. influence and policies. In December 2024, she stated on national television:

*"Fue un ejercicio de soberanía"* — "It was an act of sovereignty" — referring to her denunciation of a bilateral extradition treaty with the United States (Exhibit A, Image 1).

86.    DEFENDANT MONCADA later verbally attacked the U.S. Embassy in Honduras over its security warnings, stating:

*"La soberanía popular no la representa ninguna embajada"*    "Popular sovereignty is not represented by any Embassy" (Exhibit A, Image 5).

87.    DEFENDANT MONCADA also referred to the U.S. Engel List [23] as part of "imperialist politics" (Exhibit A, Image 4), and in response to pressure from Ambassador Laura Dogu, she declared:

---

[23] The Engel List is published by the U.S. Department of State pursuant to Section 353 of the United States–Northern Triangle Enhanced Engagement Act, enacted in the Consolidated Appropriations Act, 2021 (P.L. 116-260). It identifies foreign officials from Guatemala, El Salvador, and Honduras who have engaged in significant

*"Chocó con el muro de la resistencia"* — "She crashed into the wall of resistance" (Exhibit A, Image 3).

88. On August 8, 2025, in a televised interview, DEFENDANT MONCADA publicly expressed support for Venezuelan dictator Nicolás Maduro (who is a U.S. fugitive with a Fifty Million U.S. Dollar bounty on his head) and whom the U.S. does not recognize as the rightful president of Venezuela. U. S. Attorney General Pam Bondi accused Honduras of taking bribes to assist Venezuela with trafficking drugs to the U.S. This public alignment with a sanctioned foreign regime underscores.

89. On August 12, 2025, during a live televised interview outside the Supreme Court of Justice, National Party Congressman Jack Uriarte publicly denounced the Attorney General, DEFENDANT ZELAYA, for entering the Court to reprimand his prosecutors during the arraignment hearing of the Ministerio Público. Uriarte further explained that he and his colleagues were informed that the Attorney General met privately, *ex parte*, with Presiding Magistrate Roy Pineda of the LIBRE party. This broadcast provides independent corroboration that prosecutorial power in Honduras is being weaponized selectively for political persecution, consistent with the campaign directed against the Plaintiff. (Exhibit 73)

90. On August 18, 2025, PLAINTIFF FARMER'S most recent death threat with a cryptic but threatening warning. The message stated: *"Instead of fighting with those people you should walk away with your life. I'm giving up cause I don't want my wife and family dead. Just for money, life is worth more then [sic] money."* The communication explicitly urged Plaintiff to abandon his Judgment enforcement efforts in Honduras, invoking the threat of death to both he and his family if he continued. The sender also referenced attached images (Exhibit 51) connected to Honduran

---

corruption, obstruction of democratic processes, or undermining of the rule of law. Designation results in public naming**,** revocation of U.S. visas, and ineligibility for entry into the United States**.**

Democratic Socialist political actors, further linking the intimidation to the broader campaign of state-sponsored defamation and retaliation.

This message is not an isolated incident, but rather part of a continuing and escalating series of threats Plaintiff has received in recent months, including repeated warnings of death, harm to his family, and violent historical comparisons. The August 18 threat demonstrates the ongoing pattern of intimidation directed against Plaintiff and provides further evidence of a coordinated campaign to terrorize and coerce a U.S. national. This communication constitutes an interstate and foreign threat under 18 U.S.C. § 875(c) and an act "dangerous to human life" under 18 U.S.C. § 2331, intended to intimidate and coerce. It is attached hereto as (Exhibit 51).

91. On August 22, 2025, U.S. Congressman Carlos A. Gimenez publicly confirmed that DEFENDANT MONCADA's political campaign was being financed by the Cartel of the Suns in Venezuela[24], led by Nicolás Maduro. He warned the people of Honduras that DEFENDANT MONCADA's campaign was an instrument of the "narcosocialist Zelaya network" (Manuel Zelaya, whose wife, Xiomara Castro de Zelaya is the current President, and, DEFENDANT MONCADO, who is the alleged mistress of Manuel Zelaya, is the Democrat Socialist LIBRE Party Candidate for President in this November's elections) and tied directly to a transnational narco terrorist cartel. This congressional statement is attached hereto as (Exhibit 64).

92. On August 25, 2025, U.S. Congressman Carlos A. Giménez posted: *"Make no mistake in the U.S. Congress, we know Honduras is a pariah state under control of the criminal Cartel de*

---

[24] The term "Cartel of the Suns" (Cartel de los Soles) refers to a Venezuelan narcotics trafficking organization comprised of senior military officers—primarily from the National Guard and armed forces—who have allegedly used their official positions to facilitate large-scale cocaine trafficking in coordination with Colombian cartels and other transnational criminal groups. The name derives from the "sun insignias" worn on Venezuelan generals' uniforms, symbolizing the high-ranking officers implicated in the network. U.S. federal indictments and investigations by the Department of Justice and DEA have described the Cartel of the Suns as a state-sponsored criminal enterprise operating under the protection of elements of the Venezuelan government.

*los Soles and the corrupt Zelaya family"*(#SOSHonduras). He linked this to the House Foreign Affairs Committee's official warning that Honduras is sliding into authoritarianism under the Democratic Socialist Party (LIBRE), aligned with Venezuela and Nicaragua. Four days later, on August 29, 2025, U.S. Congresswoman María Elvira Salazar likewise denounced DEFENDANT MONCADA and her allies, stating: *"I will always report the accomplices of Castrosim like Rixi Moncada and the corrupt authoritarians like Manuel Zelaya … Honduras, do not let yourself be deceived. Say NO to the 'LIBRE' party."* These direct statements by sitting U.S. Members of Congress confirm that DEFENDANT MONCADA is recognized at the highest levels of the U.S. government as an accomplice of and her campaign for President is financed by authoritarian regimes and narco-political networks. This Congressional condemnation corroborates Plaintiffs' claims of persecution, defamation, and terrorism, and establishes that DEFENDANT MONCADA's conduct is viewed internationally as a threat to U.S. national security and stability. (Exhibit 70)

93. On September 2, 2025, DEFENDANT MONCADA appeared in a TikTok video posted online in which she claimed that a DRC attorney threatened her and the President of the Central Bank by presenting a Judgment "passed in authority of res judicata" for approximately 3 billion lempiras. DEFENDANT MONCADA stated that her failure to comply with compliance would send her to prison and dismissed the Judgment as "a corrupt judgment," further declaring she would "denounce the judge, the prosecutor, and the network of lawyers" enforcing it. This broadcast is direct evidence of her ongoing campaign of defamation, obstruction, and incitement against Plaintiffs, continuing more than two years after the Honduran Supreme Court confirmed the Judgment as a "Final and Unappealable Order". (Exhibit 67)

94. On September 4, 2025, Congressman Carlos A. Gimenez publicly denounced Rixi Moncada as "Maduro's puppet" and exposed the LIBRE party's ties to the Cartel de los Soles and illicit Venezuelan financing. He further warned that the Zelaya-Moncada regime was aligning Honduras with Venezuela, Cuba, and Communist China. (Exhibit 72)

95. Accordingly, Defendants' actions meet the definition of international terrorism under *18 U.S.C. § 2331* and support a civil damages claim under *18 U.S.C. § 2333*.

96. PLAINTIFF FARMER did not arrive in Honduras uninvited. He was there as a Contractor at the express request of the United States Government through USAID under U.S. Treaty protections. Under this Contract, PLAINTIFF FARMER and his company PLAINTIFF DRC, Inc., delivered potable water and sanitation infrastructure to over 300,000 impoverished residents of post-disaster Honduras. His work was not only legitimate, it was lifesaving and humanitarian.

97. The United States Government has a compelling interest in protecting its citizens and businesses abroad, particularly where they are subject to ideological and politically motivated attacks by foreign officials. The conduct alleged here is not merely defamatory—it is targeted economic and reputational warfare against a U.S. Citizen, the same as we see engaged in by Communist Countries worldwide.

## COUNT I – DEFAMATION PER SE

98. Plaintiffs reallege and incorporate all prior paragraphs.

99. On February 3, 2023, DEFENDANTS MONCADA and GALEAS held a live, nationally televised press conference in which they publicly named PLAINTIFF FARMER and accused him of criminal conduct, corruption, and abuse of the judicial system, all without evidence or basis in fact.

100.    DEFENDANT MONCADA specifically stated: *""Yo me hago personalmente responsable de no entregar ni un tan solo lempira…"* Translation *"I make myself personally responsible to not deliver one single Lempira…"* and described PLAINTIFF FARMER as an enemy of the Honduran people who had defrauded the State.

101.    DEFENDANT GALEAS reinforced these accusations, declaring:

> *"Denunciamos la existencia de una red de corrupción público-privada que, a través de una sentencia espuria, condenó al Estado … hemos decidido no entregar ni un solo lempira de la Caja Única del Tesoro."*
> (*Translation: "We denounce the existence of a public-private corruption network which, through a fraudulent ruling, condemned the State … we have decided not to deliver even a single lempira from the Unified Treasury Account."*)

By this statement DEFENDANT, GALEAS falsely branded PLAINTIFF'S Honduran Supreme Court "Final and Unappealable Order" — and PLAINTIFF FARMER himself — as fraudulent and corrupt.

102.    These defamatory statements were not legitimate acts of a government, but personal, retaliatory, and criminal in nature, made outside the lawful scope of any official authority. As such, they fall outside the protections of the Foreign Sovereign Immunities Act[25]. These statements were widely circulated across media platforms and specifically reached audiences in the United States, including Mobile, Alabama, where Plaintiff resides and operates his businesses.

103.    DEFENDANT MONCADA and DEFENDANT GALEAS knew that Plaintiff was a U.S. citizen and that these accusations would reverberate among his peers and community.

---

[25] The Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 – 1611, provides the exclusive basis for obtaining jurisdiction over a foreign state in U.S. courts. The Act codifies the presumption that foreign states are immune from suit but establishes specific exceptions—such as those for commercial activity, expropriation, and waiver—under which a foreign sovereign and its agencies or instrumentalities may be held liable in U.S. civil actions. See *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992).

104.    Under Alabama law, false statements that impute criminal activity or fraud to a person are considered defamation per se. Defendants' statements meet that standard.

105.    Defendants acted with actual malice, knowing their accusations were false, or with reckless disregard for the truth, motivated by political animus, retaliation, and ideological hostility toward the United States.

106.    As a result of the defamatory broadcast and subsequent online amplification, PLAINTIFF FARMER suffered serious reputational damage, threats to his personal safety, emotional trauma, and substantial business loss. His credibility in his professional network was materially harmed.

107. To ensure this action is filed within the applicable two-year statute of limitations, Plaintiffs note that DEFENDANT MONCADA has continued to publicly defame PLAINTIFF FARMER through new broadcasts, including her September 2, 2025 TikTok video in which she again labeled the "Final and Unappealable Order" as a "corrupt judgment" and accused PLAINTIFF FARMER of participating in a fabricated corruption network. These recent statements confirm that the defamation is ongoing, deliberate, and continuing well within the statutory period.

108.    Defendants' defamatory statements were not merely political speech; they were deliberate, knowing falsehoods intended to isolate and destroy the reputation of a U.S. citizen who successfully pursued legal remedies through the Legal System of Honduras.

109.    Plaintiffs seek full compensatory and punitive damages under Alabama law for defamation per se.

110.    Acts of defamation and threats were transmitted into Alabama via broadcast and social media, satisfying *Calder v. Jones* "effects test."

## COUNT II – TORTIOUS INTERFERENCE WITH JUDGMENT ENFORCEMENT

111.    Plaintiffs reallege and incorporate all prior paragraphs.

112.    Plaintiffs hold a valid, final, and enforceable "Final and Unappealable Order" issued by the Supreme Court of Honduras in the amount of One Hundred Six Million, Two Hundred Six Thousand, Four Hundred Sixty and 51/100 Dollars ($106,206,460.51) U.S. Dollars.

113.    Defendants, acting individually and outside the lawful scope of their offices, vowed to block payment of this "Final and Unappealable Order" through criminal threats, defamatory broadcasts, and ex parte directives.  Defendants, despite having no legal authority to overrule the Honduran judiciary; publicly and personally vowed to block payment of this "Final and Unappealable Order". On national television, DEFENDANT MONCADA declared her refusal to comply with the "Final and Unappealable Order", saying: *"Yo me hago personalmente responsable de no entregar ni un tan solo lempira…" translation "I make myself personally responsible to not deliver one single Lempira…"*

114.    DEFENDANT GALEAS, who represents the Attorney General's Office of Honduras (PGR), amplified DEFENDANT MONCADA's position and framed the "Final and Unappealable Order" as fraudulent, further reinforcing the refusal to comply.

115.    These declarations were made not as legitimate sovereign acts, but as part of a retaliatory campaign to obstruct enforcement of a lawful judgment. Such conduct falls outside the protections of the FSIA, because criminal obstruction and defamation of a U.S. citizen are not Acts of State. These public declarations were not only ideologically motivated, but also calculated to obstruct enforcement proceedings underway in the Honduran Courts. Their intention was to intimidate judicial actors, provoke political backlash, and create an atmosphere of hostility, threats,

and paralysis around the Plaintiff's attempt to collect on the "Final and Unappealable Order", execution.

116.    Defendants further interfered with enforcement by Plaintiffs to collect their legitimate "Final and Unappealable Order", by sending ex parte letters to the BCH ordering non-compliance with the Honduran "Final and Unappealable Order", threatening bank officials with criminal liability if they executed the Order. These threats and directives were criminal in nature and constitute unlawful interference. Defendants' actions included coordination with other Honduran institutions to pressure or threaten officials tasked with payment. They contributed to a climate where compliance with the law became politically and criminally dangerous, resulting in a breakdown of enforcement mechanisms and the denial of justice to the Plaintiffs.

117.    Under Alabama law and general principles of tort, interference with a lawful Judgment, particularly when done with knowledge, intent, and malice is actionable.

118.    Plaintiffs have suffered extensive financial harm due to this obstruction. Years after the Judgment became final, no payment has been received by Plaintiffs, due to Defendants' interference, and criminal obstruction.

119.    This interference and criminal obstruction is not protected political speech; it is targeted, extrajudicial obstruction of a U.S. citizen's right to collect a legitimate court-ordered debt. Plaintiffs seek full compensatory and punitive damages for the economic losses incurred.

## COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

120.    Plaintiffs reallege and incorporate all prior paragraphs.

121.    Defendants' conduct publicly accusing PLAINTIFF FARMER of fraud, orchestrating a defamatory campaign, and refusing to honor a lawful "Final and Unappealable Order", was extreme and outrageous and caused emotional distress.

122.     Defendants knowingly weaponized state media and institutional authority to incite hostility and hatred and intentionally broadcast direct, inflammatory and false accusations with the clear and foreseeable consequence that Plaintiff would not be paid and would be publicly endangered.

123.     Defendants were fully aware that Plaintiffs reside in Mobile, Alabama, and that these threats and defamatory broadcasts would be transmitted and viewed in the United States. Defendants knew the reputational and emotional harm would strike Plaintiff and his family in Alabama.

124.     Following this campaign, Plaintiff received death threats including references to lynching, execution, and violent historical imagery directed at Americans in Central America

125.     Plaintiff and his family experienced real and persistent fear, humiliation, and emotional trauma. His business reputation in Alabama was deeply damaged. Community members and business associates contacted him in alarm. He has suffered from anxiety, loss of sleep, and ongoing psychological distress. His pregnant wife and children have similarly suffered.

126.     Defendants knew or should have known that this intentional, malicious, and slanderous conduct was designed to cause fear and emotional distress.

127.     On or about July 28, 2025, DEFENDANT GALEAS publicly and sua sponte charged PLAINTIFF FARMER with crimes he clearly knew were false. DEFENDANT GALEAS issued an arrest warrant for PLAINTIFF FARMER, and others that he clearly knew was false.

128.     Plaintiffs seek full compensatory and punitive damages under Alabama law for the severe emotional and psychological injuries caused by Defendants' outrageous and targeted conduct.

## COUNT IV – CIVIL LIABILITY FOR ACTS OF INTERNATIONAL TERRORISM

## (18 . S.C. § 2333 – Antiterrorism Act)

129.    Plaintiffs reallege and incorporate all prior paragraphs.

130.    Under the Antiterrorism Act (ATA), 18 U.S.C. § 2333(a), any U.S. national who is injured "by reason of an act of international terrorism" may recover damages in the United States, Defendants acted individually, knowingly, outside lawful authority, and in violation of Honduran and U.S. law. Their conduct was not a sovereign act, but an intentional and planned retaliatory campaign of criminal intimidation and obstruction designed to threaten, imprison, coerce and endanger a U.S. citizen. Accordingly, their actions fall within the terrorism exception and tort exception of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1605(a)(5), 1605A

131.    International terrorism is defined in 18 U.S.C. § 2331(1) as activities that:

(A) involve violent acts or acts dangerous to human life that violate U.S. criminal laws;

(B) appear intended to intimidate or coerce a civilian population, influence the policy of a government by intimidation or coercion, or affect the conduct of a government by destructive means; and

(C) occur primarily outside the United States or transcend national boundaries.

DEFENDANTS' conduct satisfies these elements:

a. Acts dangerous to human life – Defendants issued repeated ex parte threats to Central Bank officials and judges, warning they could face criminal prosecution if they complied with lawful orders to pay Plaintiffs. Defendants also initiated a fabricated criminal prosecution against PLAINTIFF FARMER and others on July 28, 2025, alleging false charges of fraud tied to projects completed more than twenty years earlier. They obtained an arrest warrant without notice, hearing, or due process, intending to imprison PLAINTIFF FARMER in Támara National Penitentiary —

a facility notorious for gang violence, torture, and killings. These actions placed PLAINTIFF FARMER in immediate physical danger and violated U.S. criminal laws, including 18 U.S.C. § 875(c) (threats), § 2332(b) (acts against U.S. nationals abroad), and § 242 (deprivation of rights under color of law).

b. Intent to intimidate and coerce – Defendants used nationally televised press conferences to brand PLAINTIFF FARMER as corrupt, a predator, and an enemy of Honduras, triggering online threats of lynching and execution. They criminalized compliance with a lawful Judgment, threatened judges and bankers with prosecution, and fabricated criminal charges to coerce PLAINTIFF FARMER into silence and punish him for enforcing his Judgment. Their intent was to intimidate a U.S. citizen, coerce the Honduran public, and obstruct enforcement through fear.

c. Transcending national boundaries – The defamatory broadcasts, ex parte threats, and fabricated criminal prosecution occurred in Honduras but caused direct and immediate harm in Mobile, Alabama, where PLAINTIFF FARMER resides and conducts business. Plaintiffs' reputation, safety, and economic interests were directly injured in the United States, satisfying the cross-border requirement of § 2331. The threats, defamatory broadcasts, and fabricated prosecution were carried out in Honduras but had direct, intended effects in Alabama, where PLAINTIFF FARMER resides and where his business was severely damaged. This satisfies the cross-border requirement of § 2331.

132.    DEFENDANTS MONCADA and GALEAS acting individually and outside the lawful scope of any legitimate authority engaged in a targeted campaign of incitement and obstruction intended to punish a U.S. national, PLAINTIFFS and prevent payment of a lawful foreign Judgment issued in favor of Plaintiff. Because Defendants' conduct was criminal,

retaliatory, and intended to endanger a U.S. citizen, it falls outside the Foreign Sovereign Immunities Act[26]. FSIA does not shield foreign officials who commit torts, acts of terrorism, or acts outside the scope of their legitimate authority.

133.    DEFENDANT MONCADA, a Democratic Socialist Candidate for President in the upcoming Election this November repeatedly and publicly expressed her anti-American ideology in official speeches, televised declarations, and press statements, including: declaring that resisting payment of the "Final and Unappealable Order" was her "patriotic duty" and an act of Honduran sovereignty; describing U.S. policy tools, such as the Engel List, as "imperialist" acts of aggression; publicly attacking the U.S. Embassy, U.S. Ambassador Laura Dogu, and U.S. extradition agreements; and labeling the enforcement of U.S. legal instruments as a foreign imposition (Exhibit 63, Images 1, 3, 4, 5).

134.    These statements were not idle rhetoric. They coincided with her public refusal to comply with a lawful "Final and Unappealable Order", owed to Plaintiffs, broadcast on national television, in which she stated:

> *"Yo me hago personalmente responsable de no entregar ni un tan solo lempira…"*
> *(Translation: "I make myself personally responsible for not delivering even a single lempira.")*

135.    The combination of anti-U.S. ideology, public defiance, and incitement triggered a wave of death threats, hate speech, and racial slurs directed at PLAINTIFFS. These threats were a foreseeable and intended outcome of the Defendants' actions.

---

[26] See ***Samantar v. Yousuf***, 560 U.S. 305, 325–26 (2010) (holding that the FSIA does not shield foreign officials for acts taken outside the scope of lawful authority, including ultra vires and unlawful conduct); ***Boim v. Holy Land Found****. for Relief & Dev.*, 549 F.3d 685, 690–91 (7th Cir. 2008) (en banc) (holding that the ATA imposes civil liability on those who provide material support to terrorism, even indirectly). These decisions confirm that Defendants' conduct — defamatory broadcasts, ex parte threats, and fabricated criminal prosecutions — were not sovereign acts but personal misconduct that falls within the scope of the ATA.

136.    Defendants' conduct meets the statutory definition of international terrorism: it violated U.S. criminal laws, including *18 U.S.C. § 875(c), § 2332(b),* and possibly *§ 2339A*; was intended to intimidate and punish a U.S. national and to obstruct a Judgment; caused harm within the United States; and occurred outside the U.S. but was designed to have effect within it.

137.    As a direct and proximate result, Plaintiffs suffered severe financial, reputational, and emotional harm.

138.    Plaintiffs are entitled to: compensatory and punitive damages; attorneys' fees and costs under the ATA; and any other relief the Court deems just.

## **GENERAL PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter Judgment in their favor and against Defendants, and award the following relief:

1.  Compensatory Damages in an amount of One Hundred Six Million Two Hundred Six Thousand Four Hundred Sixty and 51/100 ($106,206,460.51) U.S. Dollars to be determined at trial, including but not limited to economic losses, reputational injury, and emotional distress sustained by Plaintiffs as a result of Defendants' conduct;

2.  Punitive Damages under Alabama law to be determined at trial, to punish and deter Defendants for their malicious and intentional misconduct;

3.  Minimum Treble Damages of Three Hundred Eighteen Million Six Hundred Nineteen Thousand Three Hundred Eight-One and 51/00 ($318,619,381.51) U.S. Dollars as authorized by the Antiterrorism Act, 18 U.S.C. § 2333, for injuries to a United States national resulting from acts of international terrorism;

4.  Statutory Damages, Attorneys' Fees, and Costs as provided under the Antiterrorism Act and other applicable law;

5.  Pre-Judgment and Post-Judgment Interest on all damages awarded, at the maximum rate allowed by law; and

6.  Such other and further relief, both legal and equitable, as this Court deems just and proper.

Plaintiffs demand trial by jury.

**S/Willie J. Huntley Jr.**

Attorney for Plaintiffs –HUNTW5746
The Huntley Firm, P.C.
Post Office Box 370
Mobile, Alabama 36601
Phone: (251) 232-0143
huntfirm@bellsouth.net

Done this 16th day of October 2025

DEFENDANTS TO BE SERVED VIA CERTIFIED MAIL:

Javier Efraín Bú Soto
Secretary of Foreign relations
(Secretaría de Relaciones Exteriores)
Bulevar Kuwait, contiguo a la Corte Suprema de Justicia (CSJ), Tegucigalpa, Honduras

Honduran Ministry of Foreign Affairs
Ministro de Relaciones Exteriores
Centro Cívico Gubernamental,
Casa Presidencial, Blvd. Kuwait
(contiguo a la Corte Suprema de Justicia),
Tegucigalpa, Honduras.
011-504-2236-0200 or 011-504-2236-0300