**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MURRAY PAUL FARMER and DRC, INC., an Alabama corporation,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil Action No. 25-00418-KD-MU** |
| **RIXI RAMONA MONCADA GODOY, individually and in her capacity as Minister of Finance of the Republic of Honduras and Democratic Socialist Candidate for President of Honduras, *et al.*** | ) | |
| **Defendants.** | ) | |

**<u>ORDER</u>**

This action is before the Court on Defendants Banco Central de Honduras ("BCH") and Rebeca Santos's Motion to Transfer (Doc. 22). BCH and Santos have asked this Court to transfer this case to the United States District Court for the District of Columbia because its proper venue does not lie in the Southern District of Alabama. Plaintiff Murray Farmer has not responded to the motion.[1] For the reasons stated below, the Court will **GRANT** the Motion to Transfer.

---

[1] Farmer's response was due by August 21, 2026. (Doc. 41 at 2). The Court has extended the deadline for Farmer's response three times, (Doc. 28 at 2; Doc. 37 at 5; Doc. 41 at 2), since his original deadline of March 12, (Doc. 23), giving Farmer a total of more than six months to respond since BCH and Santos filed their Motion to Transfer on February 20, (Doc. 22).

Farmer has been detained in Honduras since March. However, Farmer's detention has not interfered with his receipt of communications from the Court, including notice of the Motion to Transfer. Moreover, Farmer has filed several substantive motions and status reports—and participated in several newspaper interviews—during the past six months. Given Farmer's evident ability to communicate with this Court, officials in D.C., and local press, it is unclear why he cannot communicate with alternative local counsel and respond to the Motion to Transfer. While Farmer faces the prospect of indefinite detention in Honduras, the Court cannot indefinitely delay consideration of this motion.

## I. BACKGROUND

This action is only the latest episode in a long-running drama. In 1998, Hurricane Mitch devastated Honduras, prompting Congress to appropriate hundreds of millions of dollars to help rebuild Honduran infrastructure. The United States Agency for International Development ("USAID") administered the funds in partnership with the Fondo Hondureño de Inversión Social ("FHIS"), an instrumentality of the Honduran government. FHIS solicited bids from American companies to undertake infrastructure reconstruction projects in Honduras. In 2000, FHIS awarded a contract to DRC, Inc.—Farmer's company—pursuant to which contract Farmer's company rebuilt the infrastructure of twenty-one Honduran villages, completing the project by 2003.

By that time, however, trouble had begun to brew. USAID withdrew the funding that FHIS had needed to pay its American contractors. Finding the hose dry, Farmer's company went straight to the faucet, trying without success to obtain payment directly from USAID. Meanwhile, FHIS and USAID both accused Farmer's company of subcontracting a greater portion of its project to local companies than Honduran law permitted. In the United States, the charge petered out when the U.S. Attorney declined to prosecute Farmer's company; in Honduras, however, the accusation became a political football kept in play for a quarter of a century, culminating in the Honduran Libertad y Refundación ("Libre") administration's criminal prosecution of Farmer in 2025.

While recriminations rebounded, dollars did not. Farmer maintains that, although FHIS recognized the completion of his company's project in 2003, the Honduran government never paid for that work; Honduras asserts that Farmer's company never completed the project, upon which basis Honduran prosecutors brought criminal charges against Farmer for fraudulently demanding payment. According to Farmer, his version of the story was endorsed by a Honduran arbitration panel, which in 2009 awarded Farmer's company the cost of its reconstruction project plus profits

and interest, (Doc. 1 at 17); a Honduran trial court, which in 2022 confirmed the arbitral award and entered judgment against the Republic of Honduras for $106,206,460.51, (Doc. 1 at 21); and the Honduran supreme court, which in 2023 affirmed that judgment, (Doc. 1 at 23), leading the trial court to order BCH to pay the value of the judgment to Farmer's company, (Doc. 1 at 24). That last payment order to BCH is the first event in the instant action.

The very next day, payment order in hand, Farmer proceeded in person to the premises of the central bank to collect his company's long-delayed compensation. There, he was rebuffed. Undeterred, Farmer returned to the bank after the intervening weekend—and then again on a third, fourth, and fifth day. But, day after day, Farmer's efforts proved futile. (Doc. 1 at 24).

According to Farmer, his efforts were obstructed by Manuel Antonio Diaz Galeas ("Galeas"), the Honduran attorney general, who repeatedly instructed Santos, the president of the Honduran central bank, not to pay the judgment. Galeas allegedly sent three letters to Santos: first, after the trial court entered judgment, (Doc. 1 at 22); second, after the supreme court affirmed that judgment, (Doc. 1 at 23); and, third, after the trial court ordered BCH to pay Farmer's company, (Doc. 1 at 24). Each time, Galeas ordered Santos not to pay the judgment—which he characterized as contrary to Honduran law and irreparably harmful to the Honduran government—and threatened to criminally prosecute any BCH official who complied with it. (Doc. 1 at 22–24).

On the last day that Farmer returned to the central bank, Galeas and Rixi Ramona Moncada Godoy ("Moncada"), the Honduran minister of finance, convened a press conference in the capital of Honduras. Moncada claimed that Farmer's lawyer had instructed her to "[m]ake a wire transfer of 3 billion [lempiras] to a public–private corruption network," but "[w]e are not going to pay a corrupt judgment"; she told him to "[t]ake your judgment away." (Doc. 1 at 25). She proclaimed: "I make myself personally responsible to not deliver one single Lempira." (Doc. 1 at 25–26).

Speaking next, Galeas "denounce[d] the existence of a public–private corruption network which, through a fraudulent ruling, condemned the State," and confirmed that "we have decided not to deliver even a single lempira from the Unified Treasury Account." (Doc. 1 at 26). Farmer claims to have received numerous violent threats following that press conference. (Doc. 1 at 29).

Later that month, the Libre administration overhauled the membership of the Honduran supreme court, which then accepted the government's appeal of the trial court's judgment that their predecessors had previously denied. (Doc. 1 at 29–30). Two years later, the Honduran attorneys general directed Honduran prosecutors to bring criminal charges against Farmer, alleging that his company had never performed its contract with FHIS, so it was not entitled to payment, and thus Farmer had fraudulently obtained the Honduran trial court's judgment and payment order. (Doc. 1 at 32). Farmer "narrowly escaped this persecution by fleeing over several days through the Honduran rainforest to El Salvador." (Doc. 1 at 33). But, eight months later, Farmer was enticed to return to Honduras; upon his arrival, the Honduran police promptly arrested him and confiscated his passport. (Doc. 29 at 1–2). Farmer remains detained in Honduras. (See Doc. 40).[2]

In the interim, while in the United States, on October 16, 2025, Farmer sued BCH and several Honduran officials for the conduct described above. (See Doc. 1). Four months later, BCH and Santos appeared in this action, (see Doc. 20), and on February 20 they moved to transfer it to the United States District Court for the District of Columbia, (see Doc. 22).

[2] Shortly before Farmer was detained in Honduras, his counsel was suspended from the practice of law. (See Doc. 25). This misfortune has forced Farmer, while he is detained in a foreign country and defending himself there against criminal prosecution, to represent himself pro se in this action against the same foreign officials who are prosecuting him in that action.

## II. JURISDICTION

Before the Court reaches the question of whether this case should be transferred, it must determine whether it has subject-matter jurisdiction over this case. "[A] federal court is powerless to act without jurisdiction," so it "should inquire into whether it has subject matter jurisdiction at the earliest possible stage in the proceedings." Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d 405, 410 (11th Cir. 1999). Indeed, without subject-matter jurisdiction, the Court does not even have the power to transfer a case to another venue. See Panhandle E. Pipe Line Co. v. Fed. Power Comm'n, 343 F.2d 905, 908 (8th Cir. 1965) ("A court without jurisdiction has no power to adjudicate but can only dismiss the proceeding for lack of jurisdiction."); Atl. Ship Rigging Co. v. McLellan, 288 F.2d 589, 591 (3d Cir. 1961) ("Where, as here, the court lacks jurisdiction over the subject matter . . . which precludes it from acting at all, . . . a court lacks power to transfer."); Grand Blanc Ed. Ass'n v. Grand Blanc Bd. of Ed., 624 F.2d 47, 49 (6th Cir. 1980) ("We are of the view that since we lack subject matter jurisdiction, we have no power to transfer the case."); Klett v. Pim, 965 F.2d 587, 591 (8th Cir. 1992) ("[A] court without subject matter jurisdiction cannot transfer a case to another court.").

Farmer asserts that this Court has diversity jurisdiction because the dispute here is between "citizens of a State"—Farmer and his company—"and citizens or subjects of a foreign state"—the Honduran officials and Banco Central de Honduras. See 28 U.S.C. § 1332(a)(2).[3]

"[W]hen a plaintiff seeks to sue a foreign sovereign under a *general* federal or state cause of action," as opposed to one created specifically to sue foreign states, the FSIA is the source of subject-matter jurisdiction. Exxon Mobil Corp. v. Corp. CIMEX, S.A. (Cuba), 609 U.S. 108, 119

[3] Farmer also asserts that this Court has jurisdiction pursuant to the Anti-Terrorism Act ("ATA"). But, for reasons explained infra, the ATA does not authorize suit against the Defendants.

(2026). And "[s]uits subject to the FSIA are governed by 28 U.S.C. § 1330, which affords district courts original jurisdiction over civil actions against foreign states—" including, as defined by 28 U.S.C. § 1603(a), their political subdivisions, agencies, or instrumentalities—"provided that the suit qualifies under one of the FSIA's exceptions." Id. at 123. Accordingly, "a federal district court possesses jurisdiction over a suit against a foreign state, agency, or instrumentality only if a plaintiff invokes an FSIA exception." Id.

BCH and Santos have claimed immunity under the FSIA. (Doc. 22 at 9). Although Farmer has acknowledged that BCH is "a governmental instrumentality of the Republic of Honduras," (Doc. 1 at 1), he has not invoked an FSIA exception. The Eleventh Circuit has explained in Watson v. Kingdom of Saudi Arabia, 159 F.4th 1234, 1250 (11th Cir. 2025):

> The Foreign Sovereign Immunities Act "regulates subject matter jurisdiction and provides the only basis for courts in this country to acquire jurisdiction over a foreign state." Calzadilla v. Banco Latino Internacional, 413 F.3d 1285, 1286 (11th Cir. 2005) (quoting Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc., 179 F.3d 1279, 1290 (11th Cir. 1999)). The FSIA "provides that a foreign state is immune from the jurisdiction of the United States unless an FSIA statutory exemption is applicable." Id. (quoting Aquamar, 179 F.3d at 1290). When the FSIA is invoked, courts generally consider whether foreign sovereign immunity applies on a claim-by-claim basis. See, e.g., Saudi Arabia v. Nelson, 507 U.S. 349, 355, 113 S. Ct. 1471, 123 L. Ed. 2d 47 (1993) ("[U]nless a specified exception [to the FSIA] applies, a federal court lacks subject-matter jurisdiction over a *claim* against a foreign state." (emphasis added)).

As to the individual officials, including Santos, the Court finds that diversity of citizenship and amount in controversy are met. Farmer has sued the individual officials in both their personal and official capacities. (See Doc. 1 at 1–2). Personal-capacity suits are not subject to the FSIA. But, as explained infra, the individual officials may nevertheless have foreign sovereign immunity under the common law. And, just as under the FSIA, the Court lacks subject-matter jurisdiction if the officials are immune under common law. Eliahu v. Jewish Agency for Israel, 919 F.3d 709, 712 (2d Cir. 2019) ("The district court properly dismissed all claims against the Israeli Officials

for lack of subject matter jurisdiction because, as foreign government officials acting in their official capacity, they are entitled to immunity.").

## III. IMMUNITY

As explained supra, under the Foreign Sovereign Immunities Act ("FSIA"), foreign states are "immune from the jurisdiction of the courts of the United States," 28 U.S.C. § 1604, unless the subject matter falls within an exception to the FSIA, see 28 U.S.C. § 1605. And FSIA immunity extends to a foreign state's subdivisions, agencies, and instrumentalities. See 28 U.S.C. § 1603(a).

Foreign officials, on the other hand, are not protected by the FSIA. Samantar v. Yousuf, 560 U.S. 305, 325 (2010). But the FSIA is not the sole source of foreign sovereign immunity. When a plaintiff sues a foreign official "in his personal capacity and seek[s] damages from his own pockets," the official is instead subject to the common law of sovereign immunity. Id. An action against the same official in his official capacity, however, "should be treated as [an] action[] against the foreign state itself, as the state is the real party in interest." Id. When the state is the real party in interest, the official "is entitled to invoke [the state]'s sovereign immunity under the FSIA, as well as the FSIA's other procedural protections" to the same extent as if the state were named as a defendant. Hussein v. Maait, 129 F.4th 99, 120 (2d Cir. 2025).

### A. Untangling "Official Capacity"

It is preliminarily necessary to disentangle those circumstances in which a foreign official is *sued* in his "official capacity" from those in which the same official is sued in his personal capacity based on *acts* performed in his "official capacity." An official-capacity lawsuit is in truth a suit against the state, in which context the FSIA displaces the common law. A personal-capacity suit, on the other hand, is a suit against the individual official alone, to whom the common law

offers the possibility of official-act immunity. Official-act immunity protects a foreign official from personal liability for acts performed in his official capacity.

**B. Common Law of Sovereign Immunity**

"The doctrine of common law foreign immunity distinguishes between two types of immunity: status-based and conduct-based immunity. Status-based immunity is reserved for diplomats and heads of state and attaches 'regardless of the substance of the claim.'" Lewis v. Mutond, 918 F.3d 142, 145 (D.C. Cir. 2019). None of the individual officials in this action are diplomats or heads of state, so status-based immunity is not available.

"With respect to conduct-based immunity, foreign officials are immune from 'claims arising out of their official acts while in office.'" Yousuf v. Samantar, 699 F.3d 763, 774 (4th Cir. 2012). Official-act immunity is rooted in the "principle that sovereign immunity, which belongs to a foreign *state*, extends to an individual *official* acting on behalf of that foreign state. Id. (citing Underhill v. Hernandez, 168 U.S. 250, 252 (1897)). Before Samantar, many federal courts applied the official-act inquiry to determine whether a state's FSIA immunity extended to an official. See id. (collecting cases). Now, although Samantar bars their use in the FSIA context, "these decisions are instructive for post-Samantar questions of common law immunity." Id.

A foreign official has official-act immunity when he is sued based on "acts done in his official capacity," as contrasted against "acts that were either personal or private in nature." Belhas v. Ya'alon, 515 F.3d 1279, 1283 (D.C. Cir. 2008). The official-act inquiry asks whether (1) the official purported to act as an official; (2) he acted within the scope of his official authority; (3) his conduct was attributable to the state; and (4) the state authorized his conduct. An official acts in his official capacity when "he purport[s] to act as an official, not an individual." Chuidian v. Philippine Nat. Bank, 912 F.2d 1095, 1106 (9th Cir. 1990). When he "acts completely outside his

governmental authority," such as drug dealing, "he has no immunity." Id. At the opposite extreme, he *does* have immunity when "only his authority as a[n official] enabled him" to act and his conduct was "entirely dependent upon" his authority. Id. But the scope of his authority is not unbounded: "[*J*]*us cogens* violations are not legitimate official acts and therefore do not merit foreign official immunity." Yousuf, 699 F.3d at 776. "[A]cts of torture, execution, and disappearance [a]re clearly acts outside of [the] authority" even of a dictator "invested with extraordinary powers." In re Estate of Ferdinand Marcos, Human Rights Litig., 25 F.3d 1467, 1471–72 (9th Cir. 1994). Nonetheless, an allegation that an official "acted out of personal gain and . . . subverted [his] official position[] to advance [his] personal objectives" does not "make his action any less an action of his sovereign." Byrd v. Corp. Forestal y Indus. de Olancho S.A., 182 F.3d 380 (5th Cir. 1999). To the extent that he "act[ed] *on behalf of* the state," his conduct is attributable to the state. Estate of Ferdinand Marcos, 25 F.3d at 1472. Of course, the state has a say in whether conduct can be attributed to it. If a state expressly disavows an official's conduct, that indicates that his "acts were not taken within any official mandate." Id. On the other hand, when a state "admit[s] some knowledge or authorization of [the official's] acts," that shows that "his actions were within the authority given to him by the [s]tate." Belhas, 515 F.3d at 1284.

Applying that inquiry to the facts alleged here, first, the Defendants purported to act as officials, not individuals. Only his authority as attorney general enabled Galeas to direct the central bank not to pay funds from the Honduran treasury to Farmer, and his threat to criminally prosecute BCH officials was entirely dependent upon his official authority. Likewise, it was in her capacity as president of the central bank that Santos refused to make the payment that Galeas had forbidden her to make. The purpose of the press conference in which Moncada and Galeas allegedly defamed Farmer was to announce the policy of the Honduran government: The Honduran attorney general

declared that a judgment against the government was fraudulent, and the Honduran minister of finance refused to pay that judgment from the Honduran treasury. Regardless of the merit of their position, Moncada and Galeas represented it as the policy of the Honduran government. Their representation was confirmed when Honduran prosecutors brought criminal charges against Farmer on the same basis—another quintessentially official act.

Farmer argues that Moncada "deemed all defendants personally responsible acting outside their official duties," and thus "waived [their] sovereign immunity," when she said: "I make myself personally responsible to not deliver one single Lempira." (Doc. 1 at 25–26). But that was not Rixi Moncada refusing to pay a single lempira from her own pockets; it was the Honduran minister of finance refusing to pay a single lempira from the Honduran treasury. This is confirmed by her reference to "a judgment [that] orders the State to pay 3 billion [lempiras]" and her claim that Farmer had "managed to condemn the State to pay 3 billion [lempiras]." (Doc. 1 at 25). Galeas was even more explicit on this point: "[W]e have decided not to deliver even a single lempira from the Unified Treasury Account." (Doc. 1 at 26).

Second, the Defendants acted within the scope of their official authority. That is not to say that they acted *lawfully*; the official-act inquiry sets aside the specific contours of Honduran law, focusing instead on the general sweep of international law. The question is whether the Defendants violated a *jus cogens* norm, such as the prohibitions against torture and genocide. See Yousuf, 699 F.3d at 775–77. Farmer does not allege that the Defendants violated any *jus cogens* norm, so they appear to have acted within the scope of their official authority under international law.

Third, the Defendants' conduct was attributable to the Republic of Honduras. As discussed supra, it was only on behalf of the Honduran government that Galeas instructed Santos not to pay a judgment against the Republic of Honduras, that Moncada and Santos refused to pay money

from the Honduran treasury, and that Honduran prosecutors brought criminal charges against Farmer. No individual can pay money from the public treasury or criminally prosecute another on his own behalf; those acts could only have been undertaken on behalf of the government.

Fourth, the Republic of Honduras appears to have authorized the Defendants' conduct—or, at least, afterward acquiesced and ratified their conduct. Honduras has still not paid a single lempira of the judgment against it, nor has it dropped its criminal charges against Farmer. Indeed, after Farmer filed this action, Honduran voters thwarted Moncada's presidential ambition and tossed out the Libre administration in which the Defendants had served; nevertheless, the new National Party administration has stayed the course set by the Defendants.[4]

Altogether, every alleged fact in the complaint points toward the conclusion that the individual officials undertook the alleged acts in their official capacities. Consequently, in their personal capacities, the Defendants are entitled to official-act immunity. But that does not end the Court's inquiry into the individual officials' immunity altogether, because Farmer sued them in their official capacities as well, requiring the Court to consider whether the FSIA applies.

**C. Foreign Sovereign Immunities Act**

**1. Banco Central de Honduras**

BCH is the central bank of the Republic of Honduras, so the FSIA protects BCH to the same extent as Honduras. See Ortega Trujillo v. Banco Central del Ecuador, 17 F. Supp. 2d 1334,

[4] Marlon González & Megan Janetsky, Trump-Backed Candidate Nasry Asfura Declared Winner of Honduras' Presidential Vote, Associated Press (Dec. 25, 2025, at 1:41 CT), https://apnews.com/article/honduras-election-trump-nasry-asfura-7ebbae3330cba08e0fbb62eaadc71bcb; Marlon González, Trump-Backed Businessman Nasry Asfura Sworn In as President of Honduras, Associated Press (Jan. 27, 2025, at 19:23 CT), https://apnews.com/article/nasry-asfura-honduras-trump-election-interference-a52838ab94b1d79efe3ba0f12e8af329.

1336 (S.D. Fla. 1998). Consequently, this Court lacks subject-matter jurisdiction to hear any claim against BCH unless the claim falls within an exception to the FSIA.

Farmer's only cause of action that appears to be directed at BCH is tortious interference with judgment enforcement. (See Doc. 1 at 42–43). If this were a freestanding tort, divorced from the history of this case, it would not fall within any exception to the FSIA. BCH's defiance of the Honduran supreme court's order took place entirely in Honduras, where Farmer "deliver[ed] the Payment Order to the Central Bank of Honduras" in Tegucigalpa, (Doc. 1 at 24), and thus did not "occur[] in the United States," see 28 U.S.C. § 1605(a)(5).

But this is not a freestanding tort; it stands upon the shoulders of an arbitral award that the Honduran judiciary enforced against the Republic of Honduras. (See Doc. 1 at 17, 20–24). This case thus concerns the enforcement against a foreign state of an arbitral award that is "governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." See 28 U.S.C. § 1605(a)(6)(B). Specifically, it is governed by the Panama Convention, whose implementing statute states that "[a]rbitral decisions or awards made in the territory of a foreign State" that "has ratified or acceded to the Inter-American Convention" "shall . . . be recognized and enforced" in the United States. 9 U.S.C. § 304. Honduras has ratified the Panama Convention. See Org. of Am. States, Inter-Am. Convention on Int'l Com. Arb., Jan. 30, 1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 245, https://treaties.un.org/doc/Publication/UNTS/Volume%201438/volume-1438-I-24384-English.pdf.

Consequently, BCH is not immune from Farmer's cause of action for tortious interference with the Honduran judiciary's enforcement of the arbitral award against Honduras. Accordingly, as to BCH, the Court has subject-matter jurisdiction over that claim.

### 2. Individual Officials

In their personal capacities, the individual officials cannot look to the FSIA for protection. However, Farmer has also sued them in their official capacities. Consequently, insofar as the Republic of Honduras is the real party in interest in an action against Honduran officials, the FSIA protects the officials to the same extent that it protects Honduras itself.

#### a. Real Party in Interest

##### i. Hussein v. Maait

The Eleventh Circuit has not yet addressed the question of when to treat a foreign state as the real party in interest in an official-capacity lawsuit. The Second Circuit, however, synthesized a persuasive three-factor real-party-in-interest analysis in Hussein v. Maait:

(1) Does the complaint purport to sue the official in his personal or official capacity? Maait, 129 F.4th at 114. Courts should consider "whether the complaint's language and overall course of proceedings are more consistent with an official- or individual-capacity suit." Id. at 115.

(2) Is the substance of the claim personal or official? The purpose of the real-party-in-interest analysis is to prevent evasion of the FSIA by way of "artful pleading": "A plaintiff might be adamant that he has sued an official in his personal capacity . . . , but the ultimate determination is not for the plaintiff to make." Id. at 114. Courts must determine whether the claim is "based on personal acts" or whether "the state is the real actor and accordingly the real party in interest." Id.

(3) Does the requested relief target the official or the state? Courts must distinguish between "a 'personal capacity' suit seeking damages from the official's 'own pockets'" and "an action seeking relief directly or unavoidably from the state—because of the nature of the liability, the type or magnitude of relief sought, or a combination of these factors." Id. at 115.

Applying those factors, the Second Circuit determined that, although the plaintiff had sued the Egyptian minister of finance, Dr. Mohamed Ahmed Maait, the real party in interest was the Arab Republic of Egypt. First, the plaintiff named Maait in his official capacity. "The broader course of proceedings, too, confirms that Maait is sued officially, not personally": The plaintiff had previously sought arbitration against Egypt and repeatedly petitioned Egyptian officials to resolve his claim. Id. at 116. "Even if [the plaintiff]'s state court motion had not designated Maait as defendant in his official capacity, [the plaintiff]'s prior court and arbitration actions in court would fully support the inference that his is an official-capacity suit and that he seeks recovery against Egypt, not from Maait's personal coffers." Id. Second, "[the plaintiff]'s dispute is with the Egyptian government, not with Maait personally"; "he seeks to have *whoever* is serving [as the Egyptian minister of finance] simply facilitate his compensation from the public treasury." Id. at 117. "That Maait may have had a ministerial role to play in effectuating the government's refusal or acquiescence to pay compensation does not alter that fact." Id. Third, although the plaintiff "attempts to side-step th[e] core truth" that his target is the Egyptian treasury "by stressing that Maait is the specific official who has a 'duty imposed upon him'" to disburse the funds, the court found "no reason to infer that he ultimately seeks funds from Maait personally." Id.

**ii. Application of the Maait Factors**

The real-party-in-interest analysis in this action is not meaningfully distinguishable from Hussein v. Maait. First, Farmer has sued the individual officials in both their personal and official capacities. (See Doc. 1 at 1–2). However, Farmer emphasizes that the officials "acted outside any legitimate sovereign function" and thus "[t]hese were not sovereign acts, but personal misconduct carried out under color of office, and therefore fall outside FSIA immunity." (Doc. 1 at 26 n.16).

Looking to the broader course of proceedings, Farmer's story reads remarkably like Maait: Farmer pursued arbitration against Honduras and petitioned Honduran officials to obtain payment of the arbitral award that lurks at the root of this action. Indeed, Farmer's complaint rarely abstains for more than a few sentences from mentioning the "Final and Unappealable Order" in which the Honduran supreme court enforced the arbitral award against Honduras. All Farmer's claims circle back, ultimately, to that order: The Defendants defamed him by "falsely brand[ing] [his] Honduran Supreme Court 'Final and Unappealable Order' . . . as fraudulent and corrupt," (Doc. 1 at 40); interfered with its enforcement by "vow[ing] to block payment of this 'Final and Unappealable Order' through criminal threats, defamatory broadcasts, and ex parte directives," (Doc. 1 at 42); inflicted emotional distress by "publicly accusing [him] of fraud, orchestrating a defamatory campaign, and refusing to honor a lawful 'Final and Unappealable Order,'" (Doc. 1 at 43); and terrorized him by "issu[ing] repeated threats to Central Bank officials and judges, warning that they could face criminal prosecution if they complied with lawful orders to pay Plaintiffs [and] initiat[ing] a fabricated criminal prosecution against [him]," (Doc. 1 at 45). Page after page, Farmer reiterates this central grievance: The Honduran supreme court ordered BCH to disburse the arbitral award against Honduras, but the Honduran government refused to pay.

Second, the substance of Farmer's claims is official, not personal. Farmer creatively tiptoes around direct confrontation with Honduras by framing his grievances as torts committed by the individual officials. But the Court cannot close its eyes to the official flavor of those grievances: The Honduran minister of finance, just like the Egyptian minister of finance in Maait, refused to pay money from the Honduran treasury; the Honduran attorney general ordered the central bank not to pay; they announced that policy in a press conference in the Honduran capital; and Honduran prosecutors undertook a criminal prosecution. Those are quintessentially official acts.

Third, its nature and magnitude indicate that Farmer's requested relief unavoidably targets the Republic of Honduras. Most obviously, Farmer asks the Court to award him $106,206,460.51 in compensatory damages, (Doc. 1 at 48)—exactly the value of the judgment against Honduras, (see Doc. 1 at 42). This lawsuit thus appears to be a roundabout attempt to obtain the same payment that Farmer has spent a quarter of a century trying to collect from the Honduran government.

**iii. *Ultra Vires* Conduct**

Citing Samantar v. Yousuf, Farmer argues that "individual officials may be held personally liable when they engage in conduct that is ultra vires, criminal, or otherwise not attributable to the sovereign itself." (Doc. 1 at 26 n.16). But Samantar does not say that; it merely holds that the FSIA does not protect individual officials in their personal capacities. 560 U.S. at 325. Indeed, the Supreme Court expressly identified the possibility that the FSIA *does* protect the same officials in their official capacities when the state is the real party in interest. Id.

"Whether a foreign official is sued for unauthorized acts may in some cases, we suppose, bear on the real-party-in-interest analysis," but nevertheless the state may still be "the real party in interest, *ultra vires* act or not." Maait, 129 F.4th at 120. The Second Circuit explained that, even if Maait had acted unlawfully by "fail[ing] to faithfully execute the Decree, that failure can only be understood to reflect the reality that the Egyptian government—for its own reasons—chose" to defy that decree. Id. at 118. "This is not a case, therefore, where an official went rogue, acted patently beyond his legal authority, or disregarded explicit governmental directives; rather, [the plaintiff]'s suit challenges the manner in which Maait generally exercised his official authority as Egypt's Minister of Finance." Id. Likewise, here, the Defendants did not go rogue or disregard governmental directives. As discussed supra, Farmer's antagonists departed from the Honduran

government nine months ago, yet their successors stayed the same course: Honduras still has not paid the judgment against it, nor has it dropped its criminal charges against Farmer.

Moncada and Galeas's conduct may be unlawful, but it appears to be the official policy of the Republic of Honduras. Accordingly, Honduras is the real party in interest in this action. Each of the individual officials is thus entitled to the protections of the FSIA to the same extent as the Honduran government itself.

**b. Immunity Under the FSIA**

As explained supra, the FSIA authorizes suit against the Republic of Honduras based on Farmer's claim for tortious interference with judgment enforcement. As to that claim, Honduras and its officials thus enjoy no immunity under the FSIA.

But the FSIA does not authorize any claim arising out of libel or slander, so Honduras and its officials are immune from Farmer's claim for defamation per se—as well as his claim for intentional infliction of emotional distress, which arises out of the same defamatory campaign. Finally, Farmer's claim for international terrorism does not allege any of the terroristic acts for which the FSIA authorizes suit, so the Defendants are immune from that claim, too.

**i. Tortious Interference with Judgment Enforcement**

As discussed supra, Farmer's claim for tortious interference with judgment enforcement arises out of an arbitral award that the Honduran judiciary ordered Honduras to pay, (see Doc. 1 at 17, 20–24), so this case concerns the enforcement against a foreign state of an arbitral award governed by the Panama Convention, see 9 U.S.C. § 304, on which basis the FSIA authorizes suit, see 28 U.S.C. § 1605(a)(6)(B). Consequently, Honduras and its officials are not immune from Farmer's claim for tortious interference with judgment enforcement.

### ii. Defamation & Emotional Distress

Farmer's claims for defamation per se and intentional infliction of emotional distress are personal injury claims seeking money damages, on which basis the FSIA authorizes suit. See 28 U.S.C. § 1605(a)(5). But that exception "shall not apply to . . . any claim arising out of . . . libel [or] slander." 28 U.S.C. § 1605(a)(5)(B).

Farmer's claim for defamation per se axiomatically arises out of libel or slander, so the FSIA protects Honduras and its officials from that claim. Farmer's claim for intentional infliction of emotional distress is based on the same "defamatory campaign," (see Doc. 1 at 43–44), so that claims logically also arises out of libel or slander, and the Defendants are immune from it, too.

### iii. International Terrorism

The FSIA authorizes suit against a foreign state for terroristic acts, but only "act[s] of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). Farmer does not allege that any Defendant tortured him, killed him, or took him hostage, nor that they sabotaged an aircraft. The FSIA thus protects Honduras and its officials from Farmer's claim for international terrorism.[5]

### c. Conclusion as to FSIA Immunity

The individual officials are immune from suit on each of Farmer's claims except tortious interference with judgment enforcement, which also happens to be the only claim upon which

---

[5] Also, as discussed supra, the Defendants undertook the alleged acts in their official capacities. Citing the Anti-Terrorism Act, 18 U.S.C. § 2333, Farmer argues that it was international terrorism when the Defendants criminally prosecuted him and made defamatory statements that encouraged third parties to make violent threats against him. (See Doc. 1 at 45–48.) But, as discussed supra, those are quintessentially official acts. The Anti-Terrorism Act does not authorize any suit against "a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency thereof acting within his or her official capacity or under color of legal authority." 18 U.S.C. § 2337. Consequently, even if Farmer *had* alleged conduct that falls within an exception to the FSIA, he still could not sue the Defendants under the Anti-Terrorism Act.

Farmer appears to have sued BCH. Consequently, the Court must dismiss Farmer's other claims—for defamation per se, intentional infliction of emotional distress, and international terrorism—for lack of subject-matter jurisdiction.[6]

## IV. VENUE

Generally, venue in suits against "a defendant not resident in the United States" may lie "in any judicial district." 28 U.S.C. § 1391(c)(3). However, if any defendant is a foreign state or its subdivision, agency, or instrumentality, then venue may lie only in those districts enumerated in the FSIA venue provision. See 28 U.S.C. § 1391(f); Harris Corp. v. Nat'l Iranian Radio & Television, 691 F.2d 1344, 1349 (11th Cir. 1982) ("28 U.S.C. § 1391(f) controls the question of venue [when a party] seeks to invoke jurisdiction under the [FSIA].")

When a case is filed in a federal district in which venue does not lie, the district court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The question of whether it is in the interest of justice to transfer a case falls within "the sound discretion of the district court." Pinson v. Rumsfeld, 192 F. App'x 811 (11th Cir. 2006).

In an FSIA action, venue may properly lie:

> (1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;
> (2) in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under section 1605(b) of this title;
> (3) in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title; or

[6] It is not lost on the undersigned that the law appears to require a district court in which venue is improper to make these substantive decisions. But the law clearly prohibits a court that lacks subject-matter jurisdiction from considering transfer, and a court has no subject-matter jurisdiction over claims against a party that has foreign sovereign immunity.

> (4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

28 U.S.C. § 1391(f).

Farmer does not assert any claim in admiralty, nor does he allege that BCH is either licensed to do business or doing business in the Southern District of Alabama, so paragraphs 2 and 3 do not apply here. That leaves only two possible venues in which this action may lie: any district in which a substantial part of the events or omissions giving rise to the claims occurred, or the United States District Court for the District of Columbia.[7]

---

[7] Some case law indicates that paragraph 4 applies to an agency like BCH. See, e.g., Century Int'l Arms, Ltd. v. Fed. State Unitary Enter. State Corp. Rosvoorouzhenie, 172 F. Supp. 2d 79, 87 n.8 (D.D.C. 2001) ("Defendant qualifies under the statute as a 'foreign state or political subdivision thereof,' 28 U.S.C. § 1391(f)(4), because '[a] "foreign state" . . . includes . . . an agency or instrumentality of a foreign state,' 28 U.S.C. § 1603(a), and it is undisputed that Rosvoorouzhenie is an agency or instrumentality of Russia."); Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 106 n.9 (D.D.C. 2000) ("Venue appropriately lies in this district court because the federal venue statute provides that actions against a foreign state and a state's agent or instrumentality may be brought in the United States District Court for the District of Columbia. 28 U.S.C. § 1391(f)(4).").

However, in contradistinction with the broad application of 28 U.S.C. § 1391(f) to "a foreign state as defined in section 1603(a) of this title," Congress carefully circumscribed paragraph 4 to apply only "if the action is brought against a foreign state or political subdivision thereof," thus expressly excluding agencies and instrumentalities. See 28 U.S.C. § 1391(f)(4). That exclusive language would be rendered surplus had Congress intended paragraph 4 to use the same inclusive definition of "foreign state" as the rest of the subsection. This reading is confirmed by the fact that, whereas paragraphs 1 and 2 contain no additional exclusive language, paragraph 3 uses similar language to restrict its application only to agencies or instrumentalities, excluding states and subdivisions. See Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148, 152 (D.C. Cir. 1994) ("Section 1391(f) makes the federal district court for the District of Columbia the venue for civil actions against foreign states and their subdivisions; but it allows venue in suits against an agency or instrumentality of a foreign state 'in any judicial district in which the agency or instrumentality is licensed to do business or is doing business,' § 1391(f)(3) . . . ."); see also 17 Moore's Federal Practice § 110.32 (3d ed. 2026) ("A civil action against a foreign state or political subdivision of a foreign state (but not against an agency or instrumentality of a foreign state) may be brought in the United States District Court for the District of Columbia.").

Indeed, the United State District Court for the District of Columbia has previously transferred an action against instrumentalities alone back to the Southern District of New York, because venue was improper after the state was dismissed from the action. See Gibbons v. Republic of Ireland, 532 F. Supp. 668, 672 (D.D.C. 1982) ("It is necessary to dismiss this case as to the Republic of

**A. Venue Does Not Lie in the Southern District of Alabama**

Congress imported the language of section 1391(f)(1) from section 1391(b)(2) with minimal alteration. Compare 28 U.S.C. § 1391(f)(1), with 28 U.S.C. § 1391(b)(2); see also 14D Wright & Miller's Federal Practice & Procedure § 3810.1 (4th ed. 2026) ("Th[e] language [of 28 U.S.C. § 1391(f)(1)] is identical to the 'transactional venue' provision in the general venue statute, 28 U.S.C.A. § 1391(b)(2) . . . ."). Consequently, in the absence of any Eleventh Circuit precedent pacing the precise metes and bounds of section 1391(f)(1), district courts in this circuit have sought guidance from the abundantly litigated section 1391(b)(2). See, e.g., Rodriguez v. Imperial Brands PLC, No. 20-cv-23287, 2022 WL 18704831, at *5 (S.D. Fla. Nov. 2, 2022).

In the context of section 1391(b)(2), the Eleventh Circuit has held that "[o]nly the events that directly give rise to a claim are relevant." Jenkins Brick Co. v. Bremer, 321 F.3d 1366, 1371 (11th Cir. 2003). That means "only those acts and omissions that have a close nexus to the wrong." Id. at 1372. An act or omission that "was not itself wrongful" is irrelevant to the venue analysis, even though it may have been "a necessary event, in a causal sense, to" the alleged wrong. Id. (quoting Woodke v. Dahm, 70 F.3d 983, 985–86 (8th Cir. 1995)). And, because the venue statute

---

Ireland. As a result, venue will not lie here."); see also 14D Wright & Miller's Federal Practice & Procedure § 3810.1 n.11 (4th ed. 2026) ("When a foreign state is dismissed from a suit, leaving only its instrumentalities as defendants, venue no longer lies in the District of Columbia under Section 1391(f)(4) of Title 28, and the case will be transferred pursuant to Section 1406(a) of Title 28 to a district in which it could have been brought against the instrumentalities.").

This Court is persuaded by the latter line of authority, which limits the application of paragraph 4 only to foreign states and their subdivisions, excluding their agencies and instrumentalities. But, because Farmer purports not to sue the Republic of Honduras, that threatens to put this case in a pickle: BCH alone cannot be sued in the District of Columbia, because it is merely an instrumentality; nor can it be sued in any other judicial district, because no substantial part of the events or omissions giving rise to Farmer's claims occurred anywhere in the United States.

The revelation that Honduras is the real party in interest as to Farmer's official-capacity claims against the individual officials, however, renders venue proper in the District of Columbia.

exists for the benefit of defendants, Congress "meant to require courts to focus on relevant activities of the defendant, not of the plaintiff," id. at 1371–72 (quoting Woodke, 70 F.3d at 985)—a consideration whose importance is redoubled in the FSIA context, where sovereign defendants are entitled to immunity from suit except via the narrow path prescribed by the FSIA.

The Eleventh Circuit contrasted the Woodke approach, which it applied in Bremer, against a disfavored approach resembling "a 'minimum contacts' personal jurisdiction analysis" in which a district court improperly considered innocuous facts that were related to but did not directly give rise to the alleged wrong. Id. at 1372. For example, it was irrelevant to the venue analysis that "sales and training meetings were held in Alabama, salary and benefits ultimately came from Alabama, and the agreement was allegedly sent by Bremer to Alabama" because "these facts do not have a close nexus with the cause of action for breach of contract." Id. at 1372–73.[8]

Applying the Bremer venue analysis here, all the alleged wrongs occurred outside the Southern District of Alabama: BCH refused to pay the judgment in Honduras, (Doc. 1 at 24–25); Moncada and Galeas held the press conference in Honduras, (Doc. 1 at 25–27); and the prosecutors brought criminal charges in Honduras, (Doc. 1 at 32–35). Even the events that set the stage for the wrongs occurred there: The arbitration panel made its award in Honduras, (Doc. 1 at 14–17); the

---

[8] But see Ampac Grp. Inc. v. Republic of Honduras, 797 F. Supp. 973, 979 (S.D. Fla. 1992), aff'd 40 F.3d 389 (11th Cir. 1994) ("Defendants' contacts with the United States occurred predominantly in Miami, including some negotiation of the alleged contract that give rise to this action. Plaintiff's principal place of business is in Miami. Under § 1391(f), the subsection to the venue statute added by the FSIA of 1976, these factors are enough to lay venue in the Southern District of Florida."). That case quotes Wright and Miller as stating that the "FSIA venue statute's 'in which claim arose' language 'should be given the broader construction allowing a wider choice of forum,'" id., but that statement has since been removed, see 14D Wright & Miller's Federal Practice & Procedure § 3810.1 (4th ed. 2026). Instead, Wright and Miller now notes only that the language of section 1391(f)(1) is "identical" to section 1391(b)(2). Id.

Honduran judiciary attempted to enforce the arbitral award in Honduras, (Doc. 1 at 20–24); and Farmer attempted to collect that award in Honduras, (Doc. 1 at 24).

The only events that *may* have occurred in this judicial district are FHIS's solicitation and Farmer's company's placement of bids on the infrastructure reconstruction contract, (see Doc. 1 at 9–10), as well as some negotiation and planning, since Farmer resides and does business here, (see Doc. 1 at 6). But the contract was executed and performed in Honduras. (Doc. 1 at 10–13). And, regardless, the plaintiffs' lawful acts predating the alleged wrongs by a quarter of a century command scarce relevance to the venue analysis. See Bremer, 321 F.3d at 1371–72.

The only one of Farmer's claims for which venue may lie in the Southern District of Alabama is his claim for defamation per se. When a plaintiff alleges reputational injury, venue will lie in the district where his reputation was harmed. Hawbecker v. Hall, 88 F. Supp. 3d 723, 731 (W.D. Tex. 2015). Farmer resides and does business in the Southern District of Alabama, so this is where he would most feel any reputational harm; indeed, Farmer alleges that he has lost business and professional credibility here. (See Doc. 1 at 41). But, as discussed supra, this Court lacks subject-matter jurisdiction over that claim, so it is not relevant to the venue analysis.

Altogether, no substantial part of the events or omissions giving rise to Farmer's claims occurred here. Consequently, venue does not lie in the Southern District of Alabama.

**B. Venue Lies in the District of Columbia**

"A civil action . . . may be brought . . . in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof." 28 U.S.C. § 1391(f)(4). As discussed supra, the Republic of Honduras is the real party in interest as to Farmer's official-capacity claims against the individual officials, so the officials are "entitled to invoke [Honduras]'s sovereign immunity under the FSIA, as well as the FSIA's other procedural protections" to the same extent as Honduras were named as a defendant. Hussein v. Maait, 129

F.4th 99, 120 (2d Cir. 2025). Consequently, venue in this action properly lies in the United States District Court for the District of Columbia.

**CONCLUSION**

Accordingly, Farmer's claims for Defamation Per Se (Count I), Intentional Infliction of Emotional Distress (Count III), and International Terrorism (Count IV) are **DISMISSED** for lack of subject-matter jurisdiction. His claim for Tortious Interference with Judgment Enforcement (Count II) may proceed.

Defendants Rixi Ramona Moncada Godoy, Rebeca Santos, Manuel Antonio Diaz Galeas, Johel Antonio Zelaya Álvarez, Luis Javier Santos, and Miguel Chirinos are **DISMISSED in their personal capacities** (but not in their official capacities) for lack of subject-matter jurisdiction.

The Motion to Transfer is **GRANTED**, and it is **ORDERED** that this action is transferred to the United States District Court for the District of Columbia.

**DONE** and **ORDERED** this the **28th** day of **September 2026**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**